252 N.J. Super. 62 (1990)
599 A.2d 516
CITIZENS FOR EQUITY, ET AL., APPELLANTS,
v.
NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, RESPONDENT.
IN THE MATTER OF THE ADOPTION OF N.J.A.C. 7:1I (SANITARY LANDFILL FACILITY CONTINGENCY FUND REGULATIONS). WALTER CORSON AND CATHERINE CORSON, HIS WIFE, ET AL., PLAINTIFFS-APPELLANTS, AND CITIZENS FOR EQUITY, ET AL., PLAINTIFFS/INTERVENORS/APPELLANTS,
v.
NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued March 14, 1990.
Decided June 20, 1990.
*65 Before Judges GAULKIN, SCALERA and D'ANNUNZIO.
Cynthia L. Samuels, Assistant Deputy Public Advocate, argued the cause for appellant Thomas S. Smith, Jr., Acting Public Advocate (A-365-88T5).
Donna L. Cettei argued the cause for appellants Citizens For Equity, et al. (Klein, Cettei, Halden & Gittelman, attorneys) (A-271-88T5 and A-2465-88T5).
Thomas H. Ward argued the cause for appellants Walter Corson and Catherine Corson, et al. (Albertson, Ward & McCaffrey, attorneys) (A-2465-88T5).
Mary C. Jacobson, Deputy Attorney General, argued the cause for respondent Department of Environmental Protection (Robert J. Del Tufo, Attorney General, attorney).
PER CURIAM.
Effective July 18, 1988, the Department of Environmental Protection (DEP) revised its regulations (N.J.A.C. 7:1I-1.1 et seq.) adopted pursuant to the Sanitary Landfill Facility Closure and Contingency Fund Act (Act) (N.J.S.A. 13:1E-100 et seq.). Appellants in these consolidated appeals challenge the revised regulations and urge that the prior regulations should be applicable *66 in any event to claims filed before amendment of the regulations.

I.
The Act, adopted in 1981, is designed to insure "the proper closure of sanitary landfills" and "to provide a mechanism for the prompt and adequate compensation" for "damage resulting from improper operation or closure." N.J.S.A. 13:1E-101. To that end, the Act imposes a tax upon the owner or operator of any sanitary landfill. N.J.S.A. 13:1E-104. The revenues collected are maintained "as a nonlapsing, revolving fund" in DEP, denominated the Sanitary Landfill Facility Contingency Fund (Fund). N.J.S.A. 13:1E-105. The Fund is "strictly liable for all direct and indirect damages, no matter by whom sustained, proximately resulting from the operations or closure of any sanitary landfill." N.J.S.A. 13:1E-106a.
DEP initially promulgated regulations in 1983. 15 N.J.R. 1213(a), December 5, 1983. Those regulations provided that "[a]ny person who claims to have incurred any direct or indirect damages as a proximate result of the operations or closure of a sanitary landfill is eligible to file a claim." N.J.A.C. 7:1I-1.6(a) (repealed). "Damages" was defined as including, but not limited to, "the diminution in fair market value of any real or personal property." N.J.A.C. 7:1I-1.4 (repealed). However, DEP would "consider only those damages for which the claimant can produce substantial evidence." N.J.A.C. 7:1I-1.7(a) (repealed).
In 1986, DEP began a review of the claims processing system. According to a certification filed by David C. Mack, Acting Administrator of DEP's environmental claims administration, which has responsibility for the processing of claims filed against the Fund, that review disclosed "disturbing trends which challenged the basic framework of then-current processing policy" which "needed to be addressed before they got out of hand":

*67 Essentially, the trend we saw developing was that by not requiring property sales for property diminution damage claims, claims were being filed in a pattern unrelated to the landfill. Once a claim was satisfied without requiring the property to be sold, that settlement seemed to promote the perception of similar damages to surrounding properties. This was best evidenced by the receipt of claims from properties over two miles from GEMS Landfill. Therefore, we concluded that the Fund by its own actions was, in effect, creating the very condition which the law was enacted to remedy.
The regulations were accordingly revised in 1988, according to Mack, "to insure the continued availability of monies for people who could satisfy the requirements for compensation." The revised regulations define "damages" to include "the diminution in fair market value of any real property." N.J.A.C. 7:1I-1.5. The Fund, however, will pay "only those claims for damages for which the claimant can produce substantial evidence pursuant to N.J.A.C. 7:1I-3." N.J.A.C. 7:1I-1.7(a). N.J.A.C. 7:1I-3.3 establishes the "[c]riteria for claims based on real property value diminution damage." That regulation is the focus of these litigations:
(a) Claims for real property value diminution as a result of the operation or closure of a sanitary landfill are compensable upon sale of the property. The claimed property must be located within one-half mile of the landfill area except:
1. Claims for property value diminution which were filed prior to March 7, 1988 are not subject to the one-half mile limitation, or to the criteria at (d) below if the damaged property was sold prior to July 18, 1988, but shall meet all other criteria of this section. Damaged property shall be considered sold prior to July 18, 1988 if a binding agreement of sale was entered into prior to this date.
2. Claims for property diminution which include physical instrusion are not subject to the one-half mile limitation but shall meet all other criteria of this section.
(b) All claims filed subsequent to the effective date of this chapter for which the property has been sold prior to receipt of an appraisal of the subject property value from the Department are barred from compensation.
(c) The Department shall notify each claimant who filed a claim before March 7, 1988 of the requirements of this chapter. Such claimants shall then have 60 days from receipt of such notice to inform the Department by certified mail return receipt requested, of their intent to pursue their claim for property value diminution pursuant to this chapter, immediately, request that the claim be suspended for a period of up to two years, or to withdraw that claim for those damages. If a claimant requests suspension of their claim, the claimant may at any time during the period of suspension, request reactivation of the claim. At the end of the two year suspension period, the claim will be automatically *68 reactivated, unless the claimant has previously withdrawn the claim. Priority status of reactivated claims will be established based on the date of receipt of the reactivation request.
(d) The Department will provide a claimant with the Department's appraisal of the value of the subject property absent any landfill effects. Claimant shall, within 90 days of receipt of such appraisal, offer the property for sale with a multiple listing service at no less than the Department's appraisal value for at least 60 days and attempt to sell in good faith. The claimant shall submit to the Department a copy of the brokerage agreement. Failure to list the property for sale within 90 days of receipt of the appraisal will result in denial of the claim. If no offers are received from responsible buyers for that price, the claimant may reduce the price by 2.5 percent per month. Any variation from the above formula allowing for a larger or smaller percent reduction or an accelerated or decelerated time frame for reductions shall be approved in advance by the Department.
(e) Within 60 days after the settlement date for the property or the effective date of this rule, whichever occurs last, the claimant shall submit to the Department, as evidence of the sale and that the sale was a good faith sale, the following:
1. All written offers for the property;
2. The contract of sale for the property;
3. The settlement sheet(s), including the one required by the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C.A. 2601 et seq.;

4. The deed;
5. An affidavit by the claimant stating the total sales price of the property, that no other money or other compensation has been received from any person for the property and that the documents submitted pursuant to (e)1 through 4 above are true copies of the original documents used in the sale transaction; and
6. An affidavit from the claimant's realtor providing the following information:
i. How long the property was up for sale;
ii. What the initial listing price was;
iii. A list of any changes in the listing price;
iv. A record of all inquiries, showings or open houses held for the purpose of selling the claimant's property. This record shall include the names and addresses of all persons who inquired about, were shown or attended open houses held for the purpose of selling the property and will include a detailed description of the specific statements of these persons concerning the property;
(1) Claimants who filed claims prior to March 7, 1988 and sold property prior to July 18, 1988 will not be required to submit the names and addresses of the persons who inquired about, were shown or attended open houses held for the purposes of sale of the property; and
v. The number of offers received, the amount of each offer and date received.

*69 (f) Claimants who satisfy the criteria (a) through (d) above and have been unable to sell the property after one year of continuous good faith attempts to sell, measured from the date of listing, shall be eligible to recover damages calculated in accordance with N.J.A.C. 7:11-4.2(b). If the property is sold within two years of settlement, claimant shall satisfy all requirements of (e) above, and any paid settlement shall be subject to adjustment pursuant to N.J.A.C. 7:11-4.2(b)1.
If a property is sold, DEP will pay damages "in an amount equal to [DEP's] appraisal of the property value absent the landfill minus the actual selling price." N.J.A.C. 7:1I-4.2(a). If the claimant makes a good faith attempt but cannot sell within one year, DEP will "appraise the value of the property absent the landfill and survey sales based claims settlements in the area to determine the average percentage diminution for the area" and "shall pay, as damages, the dollar value arrived at by multiplying the appraised value of the property absent the landfill by the average diminution percentage determined for the area." N.J.A.C. 7:1I-4.2(b). Any damage award shall also be reduced "by the amount of any prior compensation for the claimed damages received by the claimant from any insurance program, from any court awards, or from any other State or Federal program." N.J.A.C. 7:1I-1.7(b).
Shortly after the revised regulations were proposed (20 N.J.R. 443, March 7, 1988), plaintiffs Walter and Catherine Corson and twelve other individuals, all of whom owned homes near the GEMS Landfill, commenced a prerogative writs action in the Law Division against the DEP, alleging that they had filed claims against the Fund and that DEP had failed to process them "within a reasonable time" as then required by N.J.A.C. 7:1I-2.3(b) (repealed). Those plaintiffs sought judgment compelling DEP to begin processing their claims under the regulations in effect at the time they were filed. Citizens For Equity (Citizens) describing itself as a group comprised of persons owning property near the GEMS Landfill, and other individuals later filed similar claims which were joined with the Corson action.
*70 As of July 18, 1988, the revised regulations were adopted and the prior regulations were repealed. On August 31, 1988 Citizens appealed to this court challenging the adoption of N.J.A.C. 7:1I-3.3 (A-271-88T5). On September 1, 1988 the Public Advocate filed an appeal challenging the adoption of that regulation as well as N.J.A.C. 7:1I-1.7(b) (A-365-88T5). By order entered December 20, 1988, Judge Lowengrub transferred the Corson and consolidated Law Division actions to this court (A-2465-88T5). We now consolidate the three appeals for disposition.

II.
Appellants first contend that the N.J.A.C. 7:1I-3.3 requirement of sale or good faith effort to sell as a precondition to a value diminution damage award is contrary to the intent of the Act and unreasonable because it frustrates the legislative intent to assure "prompt and adequate compensation" (N.J.S.A. 13:1E-101) for "all direct and indirect damages, no matter by whom sustained." N.J.S.A. 13:1E-106a. We find the argument unpersuasive.
Administrative regulations must, of course, be statutorily authorized. A.A. Mastrangelo, Inc. v. Environmental Protect. Dep't, 90 N.J. 666, 683-84, 449 A.2d 516 (1982). But they carry a presumption of validity; an attacking party must demonstrate that a regulation is unauthorized, arbitrary or unreasonable. New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 561-63, 384 A.2d 795 (1978). Appellants here make no such showing. As explained in the Mack certification, the prior regulations had generated value diminution claims for properties more than two miles from the GEMS Landfill. DEP was concerned that settlement of such claims promoted a "perception" of damage to surrounding properties: rather than simply compensating for diminutions in value, the Fund was arguably creating diminutions in value. According to Mack, DEP thus determined that the sales requirement *71 "would be a reasonable way to provide us with additional evidence of actual damage caused by the landfill operations."
The facts set forth in the Mack certification certainly provide reasonable grounds for DEP's concern. Cf. IFA Ins. Co. v. New Jersey Dept. of Ins., 195 N.J. Super. 200, 208, 478 A.2d 1203 (App.Div. 1984), certif. den., 99 N.J. 218, 491 A.2d 712 (1984). Given that reasonable concern, and the difficulty and uncertainty in establishing property value "absent landfill" (N.J.A.C. 7:1I-4.2(a), (b)), we cannot characterize as arbitrary or unreasonable DEP's decision to require value diminution to be demonstrated through the market process. Nor does the statutory requirement for "prompt" compensation require the agency to forego necessary but time-consuming steps to satisfy itself of the validity of claims. And, while it may be, as appellants argue, that some potential claimants might be unwilling or unable to sell because of health, family, financial or other personal considerations, the regulation does not conflict with the legislative mandate for payment of "all direct and indirect damages." The regulation establishes objective, neutral standards by which the fact and extent of value diminution damage are to be determined. The possibility that some persons may not be in position to meet those standards because of personal circumstances cannot be said to outweigh the general public interest in assuring that the Fund will pay only those damages which are established by objective proof. Cf. Barone v. Department of Human Services, 107 N.J. 355, 370, 526 A.2d 1055 (1987); In re Medicaid Long Term Care Serv. Bulletin, 212 N.J. Super. 48, 58-59, 513 A.2d 967 (App.Div.), certif. den., 107 N.J. 31, 526 A.2d 125 (1986).

III.
The Public Advocate also challenges the provision of N.J.A.C. 7:1I-3.3(a) which limits the award of value diminution damages to owners of properties "located within one-half mile of the landfill area." He contends that the territorial limitation *72 contravenes N.J.S.A. 13:1E-106, which makes the Fund strictly liable "for all direct and indirect damages, no matter by whom sustained, proximately resulting from the operations or closure of any sanitary landfill." We find merit in that argument.
In defining the Fund's liability, N.J.S.A. 13:1E-106a provides that "damages shall include, but not be limited to" these four categories:
(1) The cost of restoring, repairing or replacing any real or personal property damaged or destroyed:
(2) The cost of restoration and replacement, where possible, of any natural resource damaged or destroyed, including any potable water supply;
(3) The cost of any personal injuries, including medical expenses incurred and income lost as a result thereof; and
(4) The costs of the design, construction, installation, operation and maintenance of any device or action deemed necessary by the department to clean up, remedy, mitigate, monitor or analyze any threat to the public health, safety or welfare of the citizens of this State, including the installation and maintenance of methane gas monitors and vents and leachate monitoring wells and collection systems, and the sampling and analysis of any public or private potable water supply.
The half-mile limitation does not apply to any of those categories of damage: N.J.A.C. 7:1I-3.3(a)2 provides that value diminution "[c]laims for property diminution which include physical intrusion are not subject to the one-half mile limitation." Diminution of property value without physical intrusion is not specifically provided for in the statute. However, N.J.A.C. 7:1I-1.5 defines "damages" to include:
1. The cost of restoring, repairing or replacing any real or personal property damaged or destroyed, and the diminution in fair market value of any real property. [Emphasis supplied].
The 1983 regulation had provided for value diminution damages[1] without territorial limitation. The Mack certification explains the inclusion of the half-mile limitation in the 1988 revision:
While proximity to a landfill and attendant damage could be easily demonstrated in cases where there had been actual contamination of that property, many *73 of the claims we had received involved properties physically untouched by the contamination. Nevertheless, we were aware that some uncontaminated properties near landfills were hard to sell because of adverse publicity connected to the landfills. We consequently had to address issues concerning damage caused by perceptions and the impact of those perceptions on property values. Perhaps an even more difficult question was how to realistically limit such perception-based damages from a geographic perspective  that is, establishing a geographic radius around a landfill where we could reasonably assume perception-based damages might have some validity. We felt that such a geographic limitation was necessary to curb abuses of the Fund and to ensure that damages were sufficiently traceable to the landfill to justify awards. As noted above, we have had claims filings as far as two miles away from at least one landfill alleged to be the source of the damage. We were thus faced with the nagging question that, if the Fund were to continue to process all claims using the original procedures, where would the liability, based on a constantly advancing crest of negative perception, end? After considering various alternatives, we concluded that a sales requirement and geographic limitation were the best methods to answer these concerns.
In its responses to public comments received prior to its adoption of the revised regulations, DEP explained how it fixed on a territorial limitation of one-half mile:
In developing the half-mile delineation, the Department utilized an area roughly consistent with that established by the Legislature in the Major Hazardous Waste Facility Siting Act, N.J.S.A. 13:1E-49 et seq., at N.J.S.A. 13:1E-57 as the minimum buffer zone between newly established hazardous waste sites and populated areas. A 2000 foot minimum buffer zone was established by that statute and the Department agrees that any negative impacts from a sanitary landfill will probably occur within 2000 feet of its boundary. However, as a precautionary measure the Department has extended the distance to one half-mile for the purposes of this program.
20 N.J.R. 1735, July 18, 1988. While we can appreciate DEP's desire to "curb abuses" and its concern as to "where would the liability ... end," we find that resort to a territorial limitation is contrary to the Act and arbitrary.
The Legislature has provided that the Fund "shall be strictly liable for all direct and indirect damages, no matter by whom sustained, proximately resulting from the operations or closure of any sanitary landfill." N.J.S.A. 13:1E-106. That mandate is broad but unequivocal. DEP has interpreted the statute to mean that the Fund is liable for diminution of property value proximately caused by the landfill even without any physical *74 intrusion.[2] DEP does not have authority to limit the scope of the statutory liability by fashioning territorial requirements for recovery. Nor can the territorial restriction be justified as an administrative determination that, in the absence of any physical intrusion, a landfill could not proximately cause diminution of value beyond one-half mile. There is simply nothing in the administrative record to justify that conclusion. DEP's explanation that "any negative impacts from a sanitary landfill will probably occur within 2000 feet of its boundary" is unpersuasive. That purported justification is based on a statutory requirement designed to prevent physical intrusions resulting from waste facilities; since the Fund liability at issue here is for diminution of value without physical intrusion, the absence of physical intrusion cannot alone establish the absence of value diminution.

IV.
The Public Advocate also argues that DEP had no authority to adopt N.J.A.C. 7:1I-1.7(b) which provides that:
In determining the amount of an award, the Department shall reduce the award by the amount of any prior compensation for the claimed damages received by *75 the claimant from any insurance program, from any court awards, or from any other State or Federal program.
The Public Advocate argues that this section is inconsistent with N.J.S.A. 13:1E-115 which states that:
Nothing in this supplementary act shall be deemed to preclude the pursuit of any other civil or injunctive remedy by any person. The remedies provided in this supplementary act are in addition to those provided by existing statutory or common law, but no person who receives compensation for damages pursuant to any other State or Federal law shall be permitted to receive compensation for the same damages or cleanup costs under this supplementary act.
In its response to the public comments, DEP offered this justification for its rule:
Once a claimant has received compensation for damages from another source, that claimant is no longer "damaged" and has been made whole. For the Department to use Fund moneys to pay what constitutes double compensation would be inconsistent with its statutory mandate to use the fund only for compensation of damages and for administrative costs.
20 N.J.R. 1733-34, July 18, 1988. We find that judgment to be reasonable and fully consistent with the statute.
The statutory mandate is for payment of "damages." The statute does not require that the public fund provide compensation for "damages" which have in fact been compensated for through other sources. While N.J.S.A. 13:1E-115 mandates set off of compensation paid under any "State or Federal law," that cannot fairly be read as an affirmative direction that no other collateral recoveries may be set off in the determination of "damages." As the agency responsible for administration of the Fund, DEP was fully justified in interpreting "damages" to mean those losses for which a claimant has not otherwise been compensated.

V.
We reject the contention advanced by Citizens, the Public Advocate and the Corson plaintiffs that the sale requirement contained in N.J.A.C. 7:1I-1I-3.3(a) cannot be "retroactively" applied to unresolved claims filed prior to its adoption.
*76 To be sure, retroactive application of an administrative rule is not favored. Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). But imposing the sale requirement on pending claims involves at most a "secondary" retroactivity as that is described in the concurring opinion of Justice Scalia in Bowen. 488 U.S. at 220, 109 S.Ct. at 477, 102 L.Ed.2d at 507. If an administrative rule has exclusively future effects, Justice Scalia explained, it is valid even though it affects past transactions. Id.
That analysis was invoked in Chemical Waste Management, Inc. v. U.S.E.P.A., 869 F.2d 1526 (D.C. Cir.1989), in which appellants urged that E.P.A. regulations imposing requirements for leachate disposal operated retroactively. The Circuit Court recognized that a landfill operator's decision to accept certain wastes previously not deemed hazardous may have been based upon reliance on the previous regulation, but held that the new regulation fixing requirements for the disposal of leachate from those wastes did not have a "retroactive" effect:
It is often the case that a business will undertake a certain course of conduct based on the current law, and will then find its expectations frustrated when the law changes. This has never been thought to constitute retroactive lawmaking, and indeed most economic regulation would be unworkable if all laws disrupting prior expectations were deemed suspect. [Id. at 1536 (footnote omitted)].
We reasoned similarly in Prudential Ins. Co. v. Mayor and Bd. of Council, 196 N.J. Super. 482, 483 A.2d 417 (App.Div. 1984). Plaintiff, owner of an apartment house, had converted the building to condominium units six months before the adoption of N.J.S.A. 2A:18-61.31, which prohibits a rent control board from using increased costs resulting from a condominium conversion as a basis for calculating a landlord's fair return. After the adoption of the statute, plaintiff applied to the local rent control board to impose a tax surcharge on its pre-conversion tenants. The Law Division held that the statute "was not intended to be retroactive so as to apply to applications affecting buildings converted to condominium use before [its] effective date." Prudential, 196 N.J. Super. at 485, 483 A.2d 417. *77 We reversed, holding that the statute did not operate on transactions which occurred, or rights and obligations which existed, before passage of the statute:
We do not agree with plaintiff that to read the statute as we do unfairly changes the rules in the middle of the game. Although at the time of conversion applicable law entitled landlords to a surcharge for resulting increased costs, they acquired no vested right in the status of the law as it then prevailed and no legal right to rely on the expectation that all the consequences of their legal status would remain forever unchanged. It is settled that even when retroactive application is involved legislation which impairs the value of property rights is a valid exercise of the police power where the "public interest to be promoted sufficiently outweighs in importance the private right which is impaired." Rothman v. Rothman, 65 N.J. 219, 225 [320 A.2d 496] (1974). We have no doubt that N.J.S.A. 2A:18-61.31, which protects apartment tenants, who had no voice in and derived no benefit from the decision to convert, against the expense of condominium conversion, B.H. Associates v. Brudner, 185 N.J. Super. 403, 409 [449 A.2d 23] (Dist.Ct. 1982), satisfies the aforementioned criterion. [Prudential, 196 N.J. Super. at 486, 483 A.2d 417].
The N.J.A.C. 7:1I-3.3(a) sale requirement similarly does not apply retroactively or otherwise unfairly change the rules in the middle of the game. Persons who had filed claims prior to the effective date of the regulation had acquired no vested right in the status of the law as it then prevailed and no legal right to rely on the continuance of the regulations then in effect governing the making of claims. The regulation has exclusively future effects, for it establishes the procedural requirements for future awards of damages. It properly can be applied to pending claims.

VI.
Appellants urge that the N.J.A.C. 7:1I-3.3(a) sale requirement nevertheless should not be applicable to pending claims because DEP acted improperly in failing to process those claims under the prior regulations. That contention is based on the undisputed fact that in late 1986 DEP suspended its processing of claims while it undertook to revise its regulations. The revised regulations were not proposed until March 7, 1988 and claims were not processed again until after the July 18, 1988 effective date of those regulations. Appellants argue that the *78 "secret" suspension of the processing of claims was "illegal" and that the appropriate remedy is to require that all pending claims be processed under the repealed rules.
We reject that argument. The suspension of claims processing pending reconsideration of the regulations was not an administrative rule requiring public notice and hearing before it could be implemented. N.J.S.A. 52:14B-4. Rather, the interim suspension is fairly characterized as an intra-agency statement exempt from the notice and hearing requirements. N.J.S.A. 52:14B-2(e)(2). An intra-agency statement was defined in Woodland Private Study Group v. State, 109 N.J. 62, 75, 533 A.2d 387 (1987) as
(1) a communication between agency members that (2) does not have a substantial impact on (3) the rights or legitimate interests of the regulated public.
Justice Clifford, speaking for the Court, offered this gloss:
Where a legally countenanced right of a party is threatened by an internal communication of an agency, rulemaking procedure must be followed. What constitutes an interest that cannot be abridged without rulemaking procedure is not easily defined. The interest alleged must ultimately be legitimate, of justifiable concern. Many internal agency memoranda, for example, relate to prosecutorial discretion. Given limited resources, an agency must make important choices regarding which actions of the regulated public it should monitor or prosecute. In a real sense these communications can have a substantial impact on the regulated public: the memorandum may ultimately determine who is prosecuted, and knowledge of the communication might facilitate illegal conduct. The regulated public cannot be said to have a legitimate interest in frustrating the agency's enforcement mechanism, and thus public hearing and notice need not precede issuance of the internal memorandum. [Id. at 74-75, 533 A.2d 387 (emphasis in original)].
Here, as discussed above, those persons who had filed claims had no vested rights which amendment of the claims processing procedures might impair. They simply had an interest in avoiding more onerous procedures. DEP's suspension of processing of their claims in order to evaluate and revise the regulatory scheme cannot be said to have a "substantial impact" on the claimants. To paraphrase Justice Clifford, the claimants cannot be said to have a legitimate interest in frustrating DEP's reasonable effort to assure that claims against the Fund are based upon a sufficient showing.
*79 Kessler v. F.C.C., 326 F.2d 673 (D.C. Cir.1963) is instructive. Plaintiffs there challenged the Federal Communications Commission's imposition of a freeze on the acceptance of applications for certain classes of radio stations pending the adoption of new rules on the subject. Id. at 678. The freeze was imposed to permit the F.C.C. to review its broadcast rules in response to the growth in the industry. Id. Plaintiffs, who had submitted applications for broadcast facilities, appealed the freeze order. Id. at 679. The F.C.C. conceded that the order was issued summarily without prior notice and hearing. Id. As summarized by the court, the F.C.C.'s reason for not complying with the notice and hearing requirement of the Federal Administrative Procedure Act was this:
... the purpose of the `freeze' was not the establishment of new allocation standards without public participation in rule making but, to the contrary, the creation of conditions under which formal rule making proceedings can be held in an effective, efficient, and meaningful manner.
Id. at 680. The court sustained the F.C.C.'s action:
... As the Order made clear, its purpose was to impose a temporary halt on the filing of new applications pending the consideration, and possible promulgation, of new rules following notice and a public hearing. The Commission's action amounted to a temporary suspension of filing procedures within the Commission, with three exceptions, until the outmoded and unsatisfactory old rules could be reexamined in a proceeding which would conform with the requirements of public notice and hearing, and in which possible amendments to the rules might be made. [Id. at 681].
Here, too, the suspension of the administrative process was a reasonable step to permit the agency to properly perform its statutory duties. Neither the suspension itself nor DEP's failure to announce it renders the new regulation illegal or otherwise inapplicable to previously-filed claims.
Nor is there sound reason to estop DEP from applying the revised regulations to previously-filed claims. Equitable estoppel is applied to the State only rarely and only to prevent "manifest injustice." O'Malley v. Department of Energy, 109 N.J. 309, 316, 537 A.2d 647 (1987). The elements of estoppel are "a knowing and intentional misrepresentation by the party sought to be estopped under circumstances in which the misrepresentation *80 would probably induce reliance, and reliance by the party seeking estoppel to his or her detriment." Id. at 317, 537 A.2d 647. DEP's unannounced but lawful suspension of its processing of claims pending review and revision of the regulations cannot fairly be characterized as an "intentional misrepresentation," much less one that would probably induce detrimental reliance. And we reject the claimants' contention that they had detrimentally relied on the original regulations by making "family, financial, career, social and civic commitments" in the expectation that they would be compensated for value diminution without putting their homes on the market. As already discussed, the claimants had acquired no vested rights. That they had adapted their personal lives to the existing regulations is not a sufficient reason to insulate them from a change of law. Finally, it cannot be called manifestly unjust to hold pending claimants to the same requirements which are applicable to all others.

VII.
The remaining contentions advanced by appellants are clearly without merit. R. 2:11-3(e)(1)(D), (E). We invalidate the half-mile requirement set forth in N.J.A.C. 7:1I-3.3(a). In all other respects, we sustain that regulation as well as N.J.A.C. 7:1I-1.7(b). We also affirm DEP's determination to apply the 1988 regulations to previously-filed claims still pending.
Reversed in part, affirmed in part.
SCALERA, J.A.D. (Concurring in part and dissenting in part).
I agree with the majority's decision invalidating the one-half-mile limitation of the new regulations (discussed in Point III) and upholding the DEP's deduction of amounts from the collateral sources (discussed in Point IV), but take issue with some of their other conclusions (discussed in Points II, V and VI). With respect to the validity and impact of the new regulations on the pending claims in question, I do not agree with their reasoning *81 in this case to the extent that it would deprive the claimants of any opportunity to make a claim or create more of a burden for them, as will be more fully elucidated hereinafter.
In passing the Act, N.J.S.A. 13:1E-100 et seq, the Legislature made it clear that it was concerned with the impact of the "improper operation or closure sanitary landfill facilities" on all New Jersey citizens. N.J.S.A. 13:1E-101. Inter alia, it chose to create a reimbursement Fund by levying a tax upon all owners or operators of such facilities, N.J.S.A. 13:1E-104, (which could be increased if necessary, N.J.S.A. 13:1E-109c, L1987, c347, eff. Dec. 31, 1987). It also declared that, as a matter of public policy, the persons whose interests would be reflected by compilation of such a Fund, were to be "strictly liable for all direct and indirect damages, no matter by whom sustained, proximately resulting from the operation of any sanitary landfill." The Act went on to enumerate examples of the types of "damages" intended to be compensated thereby. N.J.S.A. 13:1E-106a. The Legislature also indicated its awareness that the damages to be awarded under that statute might, at times, exceed the monies then available in the Fund and provided for the administering agency's right to prioritize claims or to temporarily pay them on a pro rata basis in that event. N.J.S.A. 13:1E-109b.
My basic disagreement with the majority stems from the fact that the DEP obviously sought to bar or limit potential claimants by arbitrarily and capriciously requiring them to engage in a sale procedure requirement of their properties as a condition of filing a claim for damages. But the Legislature specifically chose not to impose such a requirement in the statute and therefore the DEP may not do so either. A.A. Mastrangelo, Inc. v. Environmental Protec. Dep't., 90 N.J. 666, 683-684, 449 A.2d 516 (1982); Haddock v. Passaic, Comm. of Dev. Dept., 217 N.J. Super. 592, 596-597, 526 A.2d 725 (App.Div. 1987), certif. den. 108 N.J. 645, 532 A.2d 228 (1987). In other words, the imposition of agency regulations requiring a sale as a condition of claim is simply not "statutorily authorized." Ibid.
*82 The Mack certification is relied upon to furnish a factual basis for DEP's actions in suspending the processing of claims because the prior regulations were creating problems. That certification sought to establish that they had resulted in the payment of claims which "demonstrated a disturbing trend" and revealed "a pattern [of claims] unrelated to the [operation or closure of] landfill[s]." The fact that DEP thereby had experienced a "flood of claims" concerning one landfill or that the agency's "claim payment procedure was ill-advised" is unpersuasive. I view those situations as arising because of the DEP's failure to insist on the "substantial credible evidence" previously required of all claimants (N.J.A.C. 7:1I-1.7(a)) or alternatively, because of the liberal rights accorded to the citizenry by the Legislature in its broadly worded Act. If it was due to the former, then DEP could and should have insisted upon the stringent standard of proof it had previously established which must be met by claimants, rather than to adopt new regulations which undertook to place unauthorized and unfair obstacles in their way. Alternatively, DEP could have gone back to the Legislature and asked it to consider rewording the Act in order to place some limits on the persons who could qualify to collect any damages. (In this regard, see the concerns also expressed in the majority opinion, at 74, note 2). Cf. Newark v. Natural Resource Coun. Dept. Env. Prot., 82 N.J. 530, 539, 414 A.2d 1304 (1980), cert. den. 449 U.S. 983, 101 S.Ct. 400, 66 L.Ed.2d 245 (1980). Accordingly, I would invalidate the new regulations to the extent that they unreasonably require real property diminution claimants to first offer their properties for sale. There is a basic unfairness in this which appears to have been discounted by the majority. Such a requirement forcibly uproots certain persons from their homes as a condition of allowing them to file a claim. K.P. v. Albanese, 204 N.J. Super. 166, 176, 497 A.2d 1276 (App.Div. 1985), certif. den. 102 N.J. 355, 508 A.2d 225 (1985).
Even assuming the validity of such a drastic change in the regulations, I can conceive of no more compelling factual situation *83 than exists here for estopping the DEP from applying such new regulations to persons who had filed their claims for damages relatively early on. Instead of implementing "prompt and adequate compensation" in these instances, DEP saw fit to delay a decision on such pending claims while it surreptitiously reviewed the substantive aspect of its procedures with an eye toward finding some way to reduce the awards. It not only unfairly kept the knowledge of such pending changes from these claimants, but did not make its ultimate position public until it was forced to under the "Administrative Procedure Act" N.J.S.A. 52:14B-1 et seq. See N.J.S.A. 13:1E-114.
I appreciate the oft cited principle that equitable estoppel is rarely applied against the State, O'Malley v. Department of Energy, 109 N.J. 309, 316, 537 A.2d 647 (1987). However, the uncontradicted allegations of the claimants regarding their many attempts to get the DEP to advise them of what was going on during that time established just such a rare situation. The DEP simply did not "turn square corners" in its dealings with these people. F.M.C. Stores Co. v. Borough of Morris Plains, 100 N.J. 418, 426, 495 A.2d 1313 (1985). As alleged by the claimants, DEP's conduct appears to have constituted "a knowing and intentional misrepresentation." O'Malley, supra, at 317, 537 A.2d 647. Moreover, the further uncontradicted allegations indicate that these claimants had relied on DEP's continuation of the standards and procedures set forth in its old regulations in assessing the merits of their claims. Thus, it is not fair to conclude, as a matter of law, that such reliance which resulted in the various personal decisions enumerated, are insignificant. W.V. Pangborne & Co. Inc., v. N.J. DOT., 116 N.J. 543, 562 A.2d 222 (1989). Cf. Hill v. Middletown Bd. of Ed., 183 N.J. Super. 36, 443 A.2d 225 (App.Div. 1982), certif. den. 91 N.J. 233, 450 A.2d 556 (1982). At the very least, I would remand for a plenary hearing concerning each individual claimant in order to determine if that doctrine is applicable.
In conclusion, I would invalidate the new regulations to the extent that they act to bar any claimant who has not complied *84 with the sale requirements thereof. Alternatively, I would remand each claim to determine if the conduct of the parties mandates that the State should be equitably estopped from raising the new regulations as to each case.
NOTES
[1] N.J.A.C. 7:1I-1.4 (repealed) defined "damages" to include diminution in fair market value of both real and personal property.
[2] Although we do not have a record of DEP's practical application of its interpretation, it appears that DEP will pay (or has paid) compensation measured by the difference between the fair market value of a claimant's home and that home's value if the landfill did not exist. See N.J.A.C. 7:1I-4.2(a) which provides that "the Department will pay the claimant damages in an amount equal to the Department's appraisal of the property value absent the landfill minus the actual selling price."

Thus, theoretically, a claimant who knowingly purchased a home in proximity to the landfill is now entitled to receive a cash payment from this public fund to make up the difference between the home's current value considering its proximity to the landfill and the higher value it would have if the landfill did not exist. This is an extraordinary remedy.
Whether the Legislature intended to be that generous is questionable. However, no party to this litigation challenges DEP's interpretation and, therefore, we do not decide whether its interpretation correctly implements the legislative intent.