952 A.2d 1127

IN RE ATTORNEY GENERAL'S "DIRECTIVE ON EXIT
POLLING: MEDIA AND NON–PARTISAN PUBLIC
INTEREST GROUPS," ISSUED JULY 18, 2007.

Superior Court of New Jersey
Appellate Division

Argued March 12, 2008—Decided August 6, 2008.

Before Judges WEFING, PARKER and LYONS.

*Frank L. Corrado* argued the cause for appellant American Civil Liberties Union of New Jersey (*Barry, Corrado, Grassi & Gibson and Edward Barocas,* of the American Civil Liberties Union of New Jersey Foundation, attorneys; *Mr. Corrado* and *Mr. Barocas,* on the brief).

*Larry R. Etzweiler,* Senior Deputy Attorney General, argued the cause for respondent Attorney General (*Anne Milgram,* Attorney General, attorney; *Nancy Kaplen,* Assistant Attorney General, of counsel; *Mr. Etzweiler,* on the brief).

The Department of the Public Advocate filed an amicus curiae brief (*Ronald K. Chen,* Public Advocate, attorney and on the brief; *Catherine Weiss,* Director, Division of Public Interest Advocacy, *Flavio L. Komuves,* Deputy Public Advocate, and *Alexander D. Gladney,* Assistant Deputy Public Advocate, on the brief).

The opinion of the court was delivered by

WEFING, P.J.A.D.

American Civil Liberties Union of New Jersey ("ACLU–NJ") appeals from a Directive issued by the Attorney General of the State of New Jersey on July 18, 2007, with respect to exit polling

activities on election days. The Directive was issued by the Attorney General in her capacity as Chief Law Enforcement Officer and Chief Election Official of the State, and thus the matter is properly before us under *Rule* 2:2–3(a)(2).

The Directive, issued to County Boards of Election and County Superintendents of Election, states the following:

In my dual capacity as the State's Chief Law Enforcement Officer and Chief Election Official, you are hereby directed to permit exit polling activity by representatives of the media and non-partisan public interest groups on election days.

The following guidelines apply to all exit polling activity within 100 feet of the outside entrance to a polling place:

1. At least two weeks before an election, a representative of a media outlet or a non-partisan public interest group must submit a letter to the applicable county board of election, identifying polling place locations where the exit polling is to be conducted.

2. The county board of election must provide an authorization letter for exit polling to the media and/or non-partisan interest group. This letter is to include the procedures that are set forth in this directive.

3. Any person conducting an exit poll must display credentials, provided by the applicable county board of election, that identify his or her name and the organization that is conducting the exit polling.

4. At all times, exit polling must be conducted in a way that does not obstruct any voter or other authorized individual who is entering or leaving the polling place.

5. Exit polling must be conducted only when a voter is exiting the polling place, and the voter's participation is strictly voluntary.

6. Exit polling can be conducted within the 100 foot zone from the outside entrance to the polling place.

7. Exit polling cannot be conducted inside the polling place, including the passageway to the polling room and the room itself.

8. There can be no electioneering on behalf of any candidate, political party or group, or referendum within the 100 foot zone.

9. No campaign paraphernalia, signs or other insignia can be displayed by any person conducting an exit poll within the 100 foot zone.

10. Any person conducting an exit poll within the 100 foot zone must comply with any directive from an election official or authorized representative to assure the orderly conduct of the election.

11. Persons conducting an exit poll cannot poll, assist, or offer materials to voters entering the polling place.

The Directive was accompanied by an explanatory letter, setting forth the Attorney General's statutory and historical analysis in support of the Directive's position.

Shortly after the Directive was issued, ACLU–NJ's Legal Director wrote to the Attorney General, inquiring whether exit polling included asking voters about their experiences at the polls, as opposed to how they cast their votes. He also noted that the Directive prohibited distribution of material to those entering a polling place and inquired whether individuals conducting exit polling could distribute material such as voters' rights cards to voters who were leaving a polling place. Finally, he inquired whether individuals or organizations not engaged in exit polling or electioneering could hand out leaflets within 100 feet of a polling place to voters either entering or exiting the polling place.

The Attorney General responded that asking voters about their experiences in voting, and if they encountered any problems or barriers, did come within the term exit polling. She also stated that distribution of any material, including voters' rights cards, would not constitute exit polling and that "activity within the 100–foot protected zone is to be limited to properly credentialed exit pollsters...."

The ACLU–NJ wishes to hand out to voters entering a polling place what it calls voters' rights cards, a sample of which it has attached to its brief. The card is wallet-sized and outlines in general terms who may vote, what to do if an individual is not allowed to vote, and provides a toll-free telephone number to call if problems with registration or voting have been encountered.[1] The card states that it is sponsored by ACLU–NJ and League of Women Voters of New Jersey. The sample does not contain any references, whether in text or in symbols, to any political party or candidate. Under the Attorney General's interpretation of the

---

[1] Although not raised by either party, we note that *N.J.S.A.* 19:12–7.1 requires the posting "in a conspicuous location in each polling place" of a voter's bill of rights.

Directive, the ACLU–NJ is prohibited from distributing such card within 100 feet of the polls to voters entering or leaving the polls.

ACLU–NJ objects to the prohibition against distribution of such voters' rights cards within 100 feet of the polls and to the Directive's requirement of prior registration of those who wish to conduct exit polling. It presents four arguments in support of its position that this Directive is invalid. In sum, it contends that 1) the Directive is not statutorily authorized, 2) that even if it were, it should have been adopted in compliance with the Administrative Procedures Act ("APA"), *N.J.S.A.* 52:14B–1 to –25, 3) that the prohibition against the distribution of voters' rights cards violates the First Amendment, *U.S. Const.* amend. I, and 4) that the notice and registration requirements for exit polling constitute an improper prior restraint.

The Attorney General contends in response that the Directive is entirely consistent with the applicable statutes, is constitutional and did not violate the APA.

While this appeal was pending, we granted the motion of the Public Advocate of New Jersey to appear as amicus curiae. The Public Advocate has filed a brief in which it contends, essentially, that the Directive is invalid because it was enacted without complying with rule-making procedures of the APA, *supra.*

I

We turn first to consideration of the statutory argument. The Attorney General cited three statutes as the authority for her promulgation of this directive, *N.J.S.A.* 19:34–6; *N.J.S.A.* 19:34–7; and *N.J.S.A.* 19:34–15. *N.J.S.A.* 19:34–6 is titled, "Obstructing or interfering with polling place or voter." It provides in pertinent part:

a. If a person shall on election day tamper, deface or interfere with any polling booth or obstruct the entrance to any polling place, or obstruct or interfere with any voter, or loiter in or near the polling place, or, with the purpose to obstruct or interfere with any voter or to unduly delay other voters from voting, spend an inordinate amount of time in the polling booth, or do any electioneering within any

polling place or within one hundred feet thereof, he shall be guilty of a crime of the third degree.

*N.J.S.A.* 19:34–7 is titled, "Violation of ballot regulations." It provides, inter alia, that no "person [shall] within the polling place or within a hundred feet thereof, loiter, electioneer, or solicit any voter." Finally, *N.J.S.A.* 19:34–15, titled "Electioneering within or about polling place," provides:

If a person shall distribute or display any circular or printed matter or offer any suggestion or solicit any support for any candidate, party or public question within the polling place or room or within a distance of one hundred feet of the outside entrance to such polling place or room, he shall be guilty of a disorderly persons offense.

 In terms of the statutory argument, the parties focus primarily on *N.J.S.A.* 19:34–15. ACLU–NJ posits two reasons why its proposed distribution of voters' rights cards is not prohibited by this statute. It points to the title of the statute, "Electioneering within or about polling place." This, it contends, is a strong indication that the aim of the Legislature in enacting this statute was to deal with attempts to influence voters entering a polling place, about to cast their votes. Distribution of voters' rights cards, it asserts, which are intended only to assure that voters are correctly informed of their legal rights with respect to an election, cannot fairly be viewed as "electioneering."

It also asserts that grammatically, the phrase "for any candidate, party or public question" modifies all of the prohibited activities. It argues that because its voters' rights cards do not "offer any suggestion or solicit any support" for a "candidate, party or public question," distribution of the cards does not run afoul of the statute.

 We do not find either argument persuasive. "[T]he title of a statute may be used as an aid in construing the statute even though it cannot be dispositive of the issue of legislative intent. Nor can it limit the plain meaning of the text." Sutherland, *Statutory Construction*, § 18.7 (6th ed.2002). "[T]he words of the heading, 'like the inscription on a tombstone,' serve only to indicate what lies below." *Aragon v. Estate of Snyder,* 314

*N.J.Super.* 635, 639, 715 *A.*2d 1045 (Ch.Div.1998) (quoting *State v. Greene,* 33 *N.J.Super.* 497, 500, 111 *A.*2d 65 (App.Div.1955)). "The title of a statute is a label, not an index, and it has been held that it should not be scrutinized with an overly technical eye." *Albert F. Ruehl Co. v. Bd. of Trs. of Sch. for Indus. Educ.,* 85 *N.J.Super.* 4, 13 (Law Div.1964).

■ Rather, we find the historical progression of our election statutes a greater indication of the Legislature's intent. "The history of an act may be examined to assist in determining what object is expressed in a title." Sutherland, *supra,* § 18.4. Our research indicates that although the Legislature has made a series of legislative revisions and changes to our election laws, *N.J.S.A.* 19:34–15 is of comparatively recent vintage. In 1890, the Legislature enacted Chapter 231 to supplement the existing 1876 statute to regulate elections. Paragraph 63 provided in pertinent part, "That no person shall do any electioneering on election day within any polling place, or publicly within one hundred feet of any polling place...." A person violating the act was subject to a penalty of twenty-five dollars. The 1890 statute did not contain a provision comparable to *N.J.S.A.* 19:34–15.

In 1898, the Legislature enacted Chapter 139, "An Act to regulate elections." Paragraph 207 provided:

> If any person shall on election day obstruct the entrance to any polling-place, or shall obstruct or interfere with any voter, or do any electioneering within any polling-place, or publicly within one hundred feet of any polling-place, he shall be deemed guilty of a misdemeanor....

Again, the 1898 statute did not contain a provision comparable to *N.J.S.A.* 19:34–15.

In 1930, the Legislature enacted Chapter 187, "An Act to regulate elections." Paragraph 438, Sec. 6 provided in pertinent part, "If any person shall on election day ... obstruct the entrance to any polling place ... or loiter, or do any electioneering within any polling place or within one hundred feet of any polling place, he shall be deemed guilty of a misdemeanor...." This is clearly the predecessor to *N.J.S.A.* 19:34–6. Paragraph 439, Sec.

7 provided in pertinent part, "nor shall any person within the polling place or within a hundred feet thereof, loiter, electioneer, or solicit any voter...." This is clearly the predecessor to *N.J.S.A.* 19:34–7. Paragraph 447, Sec. 15, of the 1930 statute provided:

> If any person shall distribute or display any circular or printed matter or offer any suggestion or solicit any support for any candidate, party or public question within the polling place or room or within a distance of one hundred feet of the outside entrance to such polling place or room, such person so offending shall be guilty of a misdemeanor.

This is clearly the predecessor to *N.J.S.A.* 19:34–15, and it has been continued in all subsequent elections enactments with language differences which are immaterial to this appeal.

In our judgment, the Legislature, by enacting Paragraph 447, Sec. 15 in 1930, and its successor-provisions, must have envisioned something broader than a prohibition on distribution of material in support of, or in opposition to, a candidate or issue on the particular ballot. If that were all the Legislature had intended to prohibit, Paragraph 447, Sec. 15 and *N.J.S.A.* 19:34–15 would be surplusage and unnecessary; that activity was already prohibited by Paragraph 438, Sec. 6 and Paragraph 439, Sec. 7 and *N.J.S.A.* 19:34–6 and –7.

Such a construction would run afoul of the principle that a court should not easily conclude that a legislative enactment is surplusage. *Bd. of Educ. v. N.J. State Bd. of Educ.*, 372 *N.J.Super.* 341, 349, 858 *A.*2d 576 (App.Div.2004); *Foy v. Dayko*, 82 *N.J.Super.* 8, 13, 196 *A.*2d 535 (App.Div.) *certif. denied*, 41 *N.J.* 602, 198 *A.*2d 446 (1964). Language used by the Legislature should not, if it can reasonably be avoided, be found to be superfluous. *In re Sussex County Mun. Utils. Auth.*, 198 *N.J.Super.* 214, 217, 486 *A.*2d 932 (App.Div.), *certif. denied*, 101 *N.J.* 267, 501 *A.*2d 934 (1985). Further, a construction which would make a statutory provision redundant should be avoided. *Marley v. Borough of Palmyra*, 193 *N.J.Super.* 271, 294, 473 *A.*2d 554 (Law Div.1983).

■ We also reject ACLU–NJ's grammatical argument. We do not consider the placement of a comma (whether errant or deliberate, it is impossible to tell) of sufficient weight to counterbalance the historical progression we have noted. "Although punctuation is to be considered when interpreting a legislative enactment, it must be weighed against other factors indicative thereof...." *Raybestos–Manhattan, Inc. v. Glaser,* 144 *N.J.Super.* 152, 172, 365 *A.*2d 1 (Ch.Div.1976), *aff'd,* 156 *N.J.Super.* 513, 384 *A.*2d 176 (App.Div.1978).

We agree with the Attorney General's construction of *N.J.S.A.* 19:34–15: the Legislature intended that no matter how innocuous the material, nothing may be distributed or displayed to a voter within 100 feet of the outside entrance of a polling place.

II

ACLU–NJ further argues that adopting such a construction is an unconstitutional limitation on expressive activity. It contends that the statute, as interpreted by the Attorney General's Directive to permit exit polling within 100 feet of a polling place, constitutes a content-based regulation, permitting some activities while banning others. It is thus subject, ACLU–NJ argues, to strict scrutiny. ACLU–NJ concludes that such an interpretation of the statute cannot withstand such scrutiny, *Burson v. Freeman,* 504 *U.S.* 191, 112 *S.Ct.* 1846, 119 *L.Ed.*2d 5 (1992).

The Attorney General disagrees. While noting that ACLU–NJ's position that it should be allowed to distribute non-partisan, non-electioneering material within 100 feet of a polling place would result in a content-based restriction rather than a content-neutral restriction, the Attorney General urges that the Court's plurality opinion in *Burson* clearly supports as constitutional her statutory interpretation as supplemented by the Directive.

In *Burson,* the Court had before it a Tennessee statute which prohibited within 100 feet of a polling place "the display of campaign posters, signs or other campaign materials, distribution of campaign materials, and solicitation of votes for or against any

person or political party or position on a question." 504 *U.S.* at 193–94, 112 *S.Ct.* at 1848, 119 *L.Ed.*2d at 11. The Tennessee Supreme Court had struck down the statute as not sufficiently narrowly tailored and not the least restrictive means to serve the State's interests in regulating the conduct of elections. *Id.* at 195, 112 *S.Ct.* at 1849, 119 *L.Ed.*2d at 12.

A plurality of the Court disagreed and upheld the constitutionality of the statute. It noted that because the statute was a "content-based restriction on political speech in a public forum," it was "subjected to exacting scrutiny: The State must show that the 'regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.'" *Id.* at 198, 112 *S.Ct.* at 1851, 119 *L.Ed.*2d at 13–14 (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 *U.S.* 37, 45, 103 *S.Ct.* 948, 955, 74 *L.Ed.*2d 794, 805 (1983)).

 It had no difficulty in concluding that the statute was aimed at a compelling state interest: protecting voters from confusion and undue influence and preserving the integrity of the electoral process. *Id.* at 199, 112 *S.Ct.* at 1851, 119 *L.Ed.*2d at 14. The Court's review of the history of elections, from the time of the country's founding through adoption of the Australian ballot and thereafter, led it to conclude that the statute was necessary to serve that interest. *Id.* at 200, 112 *S.Ct.* at 1852, 119 *L.Ed.*2d at 15. It held, "We find that this widespread and time-tested consensus demonstrates that some restricted zone is necessary in order to serve the States' compelling interests in preventing voter intimidation and election fraud." *Id.* at 206, 112 *S.Ct.* at 1855, 119 *L.Ed.*2d at 19. It went on to state:

> We do not think that the minor geographic limitation prescribed [one hundred feet, as here] constitutes such a significant impingement. Thus, we simply do not view the question whether the 100–foot boundary line could be somewhat tighter as a question of "constitutional dimension." Reducing the boundary to 25 feet, as suggested by the Tennessee Supreme Court, is a difference only in degree, not a less restrictive alternative in kind.... [I]t takes approximately 15 seconds to walk 75 feet. The State of Tennessee has decided that these last 15 seconds before its citizens enter the polling place should be their own, as free from interference as possible. We do not find that this is an unconstitutional choice.

[*Id.* at 210. 112 *S.Ct.* at 1857, 119 *L.Ed.*2d at 21 (internal quotation marks omitted).]

In our judgment, these words are equally applicable to the present matter.

Subsequent cases do not detract from our analysis. ACLU–NJ points, for instance, to *Anderson v. Spear,* 356 *F.*3d 651 (6th Cir.), *cert. denied, Stumbo v. Anderson,* 543 *U.S.* 956, 125 *S.Ct.* 453, 160 *L.Ed.*2d 317 (2004), in which the court invalidated a Kentucky statute which forbade "electioneering" within five hundred feet of polling places. The court noted the State's inability to establish any justification for this sweeping prohibition. *Id.* at 666 (noting that the statute "prohibit[ed] speech over too much geography [and] more speech than is necessary to meet the State's protected interest")

In *CBS Broad., Inc. v. Cobb,* 470 *F.Supp.*2d 1365 (S.D.Fla.2006) the district court granted an injunction against the enforcement of a Florida statute prohibiting exit polling within 100 feet of a polling place. The court held the statute "impermissibly pro-scribe[d] constitutionally protected exit polling [and was] not narrowly tailored to address the significant interests of the State." 470 *F.Supp.*2d at 1366. We do not consider the Directive similarly infirm.

Further, we consider it entirely appropriate to acknowledge the potential difficulties that could flow from adopting the position of ACLU–NJ that it should be permitted to distribute its voters' rights cards to individuals entering a polling place. We have no reason to doubt the sincerity or integrity of ACLU–NJ in its stated goal of assuring that each voter in New Jersey is aware of his or her legal rights when entering a polling place. It is not beyond the realm of imagination, however, that less scrupulous individuals might attempt to secretly place within an otherwise innocuous pamphlet material urging a vote for or against a particular candidate. We are not so far removed from the days when all that was necessary to assure a vote was to distribute a card bearing the letter of the column the voter was to select,

memorialized in the phrase "Row A all the way." Detection of such activities would pose significant problems in enforcement.

It would, moreover, make the polling places a magnet for individuals seeking to circulate material in favor of or in opposition to a pet cause. It would place an intolerable burden on local election workers to determine whether the material is, in fact, non-partisan and non-electioneering.

New Jersey has chosen, as did Tennessee, to permit its voters at least a brief sanctuary from solicitation and importuning as they approach a polling place. We perceive no constitutional prohibition to its efforts.

## III

We turn now to the contention, advanced both by ACLU–NJ and the Public Advocate, that even if the Directive were to pass statutory and constitutional muster, as we have concluded that it does, it is invalid because it was not promulgated in accordance with the APA, *supra*. The Attorney General, while not conceding that there should have been compliance with the Act, has taken steps to promulgate a regulation governing the issuance of credentials for those who wish to engage in exit polling. 40 *N.J.R.* 1772 (April 7, 2008). Because the regulation is not in place, however, we cannot deem the issue moot.[2]

An "administrative rule" is defined by statute as

each agency statement of general applicability and continuing effect that implements or interprets law or policy, or describes the organization, procedure or practice requirements of any agency. The term includes the amendment or repeal of any rule, but does not include: (1) statements concerning the internal management or discipline of any agency; (2) intraagency and interagency statements; and (3) agency decisions and findings in contested cases.

[*N.J.S.A.* 52:14B–2(e).]

---

[2] Similarly, because the regulation is not yet in place, we do not pass upon its sufficiency. We have, however, noticed that neither the proposed regulation nor the Directive specify that exit polling must be conducted in such a manner as not to influence or affect how those entering the polls may decide to cast their votes.

■ The Supreme Court has held that "an agency determination must be considered an administrative rule when all or most of the relevant features of administrative rules are present and preponderate in favor of the rule-making process." *Metromedia, Inc. v. Dir., Div. of Taxation,* 97 *N.J.* 313, 331, 478 *A.*2d 742 (1984). The Court enumerated the factors that must be considered in the course of determining whether the agency must proceed by way of an agency rule. Those factors are whether the administrative determination

(1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group;

(2) is intended to be applied generally and uniformly to all similarly situated persons;

(3) is designed to operate only in future cases, that is, prospectively;

(4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization;

(5) reflects an administrative policy that

(i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or

(ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and

(6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy.

[*Id.* at 331–32, 478 *A.*2d 742.]

■ These factors are not conjunctive; that is, "not all of the factors must be present for an agency action to constitute rule-making; instead, the factors are balanced according to weight." *In re Protest of Coastal Permit Program Rules,* 354 *N.J.Super.* 293, 362, 807 *A.*2d 198 (App.Div.2002). Further, that all of these factors may be present is not dispositive. "To be sure, some agency actions are not subject to the APA's formal notice and comment requirements even if they satisfy the *Metromedia* criteria." *Univ. Cottage Club v. N.J. Dep't of Envtl. Prot.,* 191 *N.J.* 38, 55, 921 *A.*2d 1122 (2007).

*Citizens for Equity v. N.J. Dep't of Envtl. Prot.,* 252 *N.J.Super.* 62, 599 *A.*2d 516 (App.Div.1990), *aff'd,* 126 *N.J.* 391, 599 *A.*2d 507 (1991) illustrates the principle. There, the Supreme Court agreed

with our conclusion that the Department had the authority to suspend the processing of landowners' claims for compensation with respect to the operation of landfills without first having complied with the APA because the Department was attempting to correct and streamline the procedure. *Id.* at 78, 599 *A.*2d 516. The Court noted, "[g]overnment has a duty to correct itself, and courts should not stand in the way when a governmental agency, acting in the public interest, attempts to improve its procedures." 126 *N.J.* at 396, 599 *A.*2d 507.

We turn now to a consideration of whether the *Metromedia* factors are present in the instant matter. Clearly, the first three factors are present. The Directive is intended to affect a large segment of the public, not a narrow, select group; it is intended to be applied generally and uniformly; and it is intended to operate prospectively. In our judgment, it also satisfies the fourth factor; the authority to conduct exit polling is not clearly inferable from the applicable statutes.

The parties dispute whether the Directive satisfies the fifth factor; ACLU–NJ and the Public Advocate contend it represents a change in position while the Attorney General contends that it is entirely consistent with past practice. Analysis of this factor requires that we set forth additional historical background.

In 1988, then-Attorney General Cary Edwards issued an opinion letter to the Secretary of State, advising her that exit polling conducted within 100 feet of the entrance to a polling place was not prohibited by statute. This represented a change from the Attorney General's prior statutory interpretation and, according to the opinion letter, was based upon *Daily Herald Co. v. Munro,* 838 *F.*2d 380 (9th Cir.1988), and *CBS Inc. v. Smith,* 681 *F.Supp.* 794 (S.D.Fla.1988), both cases concluding that a ban on exit polling infringed upon the First Amendment rights of the press. The opinion noted that instances of exit polling would have to be examined on a "case-by-case basis" to determine whether there was any obstruction or interference with voter access to a polling place. The opinion letter dealt only with exit polling conducted by

representatives of media outlets; we infer that it is for that reason that it is silent on the question of credentials for those involved in such polling. The opinion did not address the question of distribution of material by organizations such as ACLU–NJ, and thus the long-standing ban on such distribution remained in place.

In 2006 correspondence was sent to then-Attorney General Zulima Farber on two occasions, urging that "[o]rganizations engaging in non-partisan poll monitoring" be permitted to function within the 100–foot statutory boundary and requesting a clarification of who was permitted within this 100–foot boundary. One letter was sent from ACLU–NJ, the other on behalf of a project jointly sponsored by ACLU–NJ and other organizations.

The Attorney General responded in August 2006 by advising the respective county boards and superintendents of election that "non-partisan public interest groups" would be permitted to conduct exit polling within 100 feet of a polling place and "to offer voter rights pamphlets" to voters entering or leaving the polling place. The letter also noted that a revised directive was being prepared to set forth applicable guidelines.

In September 2006, then-Attorney General Rabner circulated a draft Directive to the county boards and superintendents of election. This draft Directive provided for exit polling within 100 feet of a polling place by representatives of a media outlet or "nonpartisan interest group." It provided for notification two weeks in advance of when the exit polling was to be conducted. This draft Directive contained the following concluding paragraph:

> Any person who is conducting an exit poll is permitted to offer a voter a voter rights pamphlet, or other material related to the polling activity, prior to the voter entering the polling place, but such material cannot reference any candidate, political party or group, or referendum. Any such material is to be provided to the county election office and the Attorney General at least three weeks before election day.

A number of comments and responses were received. The record before us indicates that the Camden County Board of Election, New Jersey Association of Election Officials, the Republican State Committee, the Salem County Board of Election, the

Middlesex County Board of Election and certain legislators all raised concerns about this final provision.

In October 2006 then-Attorney General Rabner formally solicited the views of plaintiff, various other organizations, the county boards and superintendents of elections, and the Public Advocate with respect to three questions: 1) should non-partisan public interest groups be permitted to conduct exit polls within the 100–foot boundary, 2) should such groups be permitted to distribute voter rights pamphlets within that 100–foot zone, and 3) should representatives of such groups be permitted to approach voters for any reason within that 100–foot zone.

The record includes a number of responses, some expressing significant concern about the proposal to permit non-partisan public interest groups to conduct exit polling and distribute material within 100 feet of the polling place, others saying that the draft Directive was still too restrictive. The Directive on appeal before us, permitting non-partisan public interest groups to conduct exit polling within 100 feet of a polling place but requiring they register two weeks in advance of an election and barring them from the distribution of voter material within that 100–foot zone, was issued after consideration of all the responses.

Several factors lead us to agree with the Attorney General that the present Directive does not represent a "material and significant change from a clear, past ... position," and thus that the fifth *Metromedia* factor is not present. We note initially that the 1988 letter from the Attorney General was issued as a Formal Opinion, submitted in response to a request for legal advice. The 2006 correspondence upon which ACLU–NJ and the Public Advocate rely has no such imprimatur. Rather, the Attorney General's letter of August 31, 2006, clearly states that it is in response to the correspondence to which we have referred. The letter of even date to the county boards and superintendents advising of this was not a Formal Opinion, and it contains no indication that there had been any request to the Attorney General for legal advice on the issue.

Further, it cannot escape our notice that the requests to the Attorney General to permit non-partisan public interest groups to engage in exit polling within 100 feet and to distribute informational material such as voters' rights cards and the detailed responses to the September 2006 draft Directive contain no indication that either ACLU–NJ or the Public Advocate considered that there would have to be compliance with the APA to implement their requests. It strikes us as anomalous for a party to request that a directive be revised, and when the revisions are issued but are considered not entirely satisfactory, to contend that the document is invalid because there was no adherence to procedures never invoked previously.

We have previously noted that analyzing the *Metromedia* factors involves more than a determination of whether the factors are present in the first instance; it involves a qualitative assessment and weighing process. Having reviewed this record carefully, we ascribe the greatest weight to our conclusion that the fifth *Metromedia* factor is absent. We are satisfied that the formal position of the Attorney General has remained essentially consistent since the initial determination that media representatives must be allowed to conduct exit polling. The 2007 Directive, in our judgment, may fairly be characterized as an "effort to improve procedures." *Citizens for Equity, supra.* It attempted to provide greater access to entities such as plaintiff, and we find no basis to strike the Directive as improper rule-making.

IV

ACLU–NJ raises one final argument, that the "notice and approval requirements" of the Directive are invalid as an improper prior restraint. The entire premise of the argument is that it is constitutionally infirm to require it to obtain permission before engaging in an expressive activity such as exit polling.

This premise, however, is faulty. Nothing within the Directive requires that an entity such as plaintiff obtain approval to conduct exit polling activities. The Directive merely requires

that it notify the appropriate county board of election of the sites it is to utilize at least two weeks in advance of the election. Nothing within the Directive authorizes a county board to deny plaintiff the opportunity to conduct its exit polling. The Directive calls for the county board to provide an authorization letter; nothing within the Directive would permit the county board to refuse to issue such an authorization. Indeed, the Directive specifies the board "must" provide such a letter.

The two-week period and the authorization letter are, in our judgment, entirely reasonable. Absent such an authorization letter, it would be impossible to monitor which individuals could properly approach a voter within 100 feet of the entrance to the polling place.

### V

The application to invalidate those portions of the Directive of the Attorney General dated July 18, 2007, which bar the distribution of voters' rights cards within 100 feet of the entrance to a polling place and which require notification to an election board two weeks in advance of an election of those sites at which a nonpartisan public interest group intends to conduct exit polling is denied.