## STATE OF NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION AND ENERGY, Plaintiff,

v.

## GLOUCESTER ENVIRONMENTAL MANAGEMENT SERVICES, INC. et al., Defendants.

### Civ. A. No. 84–0152 (JBS).

United States District Court, D. New Jersey.

Sept. 1, 1994.

---

Deborah Poritz, Atty. Gen. of New Jersey, Edward Devine, Deputy Atty. Gen., Trenton, NJ, for plaintiff New Jersey Dept. of Environmental Protection and Energy.

William S. Greenberg, McCarter & English, Newark, NJ, for defendant Township of Gloucester.

John B. Kearney, Kenney & Kearney, Cherry Hill, NJ, for defendants Amadei Sand & Gravel, Inc. and Anthony Amadei, as Officer, Shareholder and/or Director of Amadei Sand & Gravel, Inc.

Jeffrey P. Heppard, Parker, McCay & Criscuolo, Marlton, NJ, for defendants Gloucester Environmental Management Services, Inc., Richard Winn, David Ehrlich, and Anthony Amadei, as Officers, Shareholders and/or Directors of Gloucester Environmental Management Services, Inc.

## OPINION

SIMANDLE, District Judge:

Presently before the court are the motions of defendant Township of Gloucester and the defendant Operators[1] for partial summary judgment, seeking to dismiss the various lien claims made against them herein by the plaintiff, New Jersey Department of Environmental Protection and Energy ("NJDEPE") under the Sanitary Landfill Facility Closure and Contingency Fund Act, N.J.S.A. 13:1E–100, et seq. ("Closure Act"), which total approximately $6 million in claims paid to date. These claims were largely paid to property owners in the general vicinity of the Gloucester Environmental Management Services ("GEMS") Landfill who allegedly suffered diminution in property value due to the operation or closure of the Landfill, under a Closure Act provision that created an NJDEPE-administered fund which is held "strictly liable for all direct and indirect damages ... proximately resulting from the operation or closure of any sanitary landfill." N.J.S.A. 13:1E–106. The principal issues decided in this motion are: whether the Closure Act authorizes payment for diminution in property value where no tangible physical damage has occurred to the property; whether the methodology adopted by NJDEPE for addressing such diminution of value claims is arbitrary and capricious; and whether various types of diminution in value claims paid by the Fund are barred by the Closure Act's statute of limitations. For the reasons set forth below, the motions are granted in part, and denied in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND[2]

This court has subject matter jurisdiction under 28 U.S.C. § 1331.[3] The cause of action discussed in the present motion arises under the law of New Jersey and is within this court's supplemental jurisdiction, 28 U.S.C. § 1367(a).

---

1. The Operator Defendants consist of the defendants which allegedly operated the GEMS Landfill at times relevant to the litigation. These parties are Amadei Sand & Gravel, Inc., Anthony Amadei, as officer, shareholder and/or director of Amadei Sand & Gravel, Inc., Gloucester Environmental Management Services, Inc. ("GEMS"), Richard Winn, David Ehrlich, and Anthony Amadei, as officers, shareholders and/or directors of GEMS only ("Operators").

2. The procedural and factual background of this case is set forth in greater detail in New Jersey Dept. of Environmental Protection v. Gloucester Environmental Management Services, Inc., 719 F.Supp. 325, 328–30 (D.N.J.1989).

3. Id. at 329–330, 333–335.

The present litigation arose out of the closure of the Gloucester Environmental Management Services, Inc. ("GEMS") landfill site located in Gloucester Township, New Jersey. The sixty-acre GEMS site was established in the late 1950's by the Township of Gloucester and operated at various times by Amadei Sand & Gravel, Inc., GEMS, and others until its state-ordered closure on November 4, 1980. While in operation it received toxic municipal and industrial liquid and solid waste from hundreds of different sources.

In 1980 the New Jersey Department of Environmental Protection and Energy (the "NJDEPE") filed suit to force the closure of the landfill and to recover clean-up costs. Eventually the United States Environmental Agency (the "EPA") became involved in the clean-up, identifying GEMS as a Superfund site in July 1982, and listing the GEMS landfill as twelfth on its national priority list of hazardous waste sites. *See* 40 C.F.R. Part 300, Appendix B (1992).

The instant motion focuses on whether plaintiff NJDEPE acted reasonably in implementing the New Jersey Sanitary Landfill Closure and Contingency Fund Act (the "Closure Act" or the "Act"), N.J.S.A. 13:1E–100, *et seq.*[4] The Closure Act, enacted in 1981, created a fund (the "Fund") to be held "strictly liable for all direct and indirect damages ... proximately resulting from the operation or closure of any sanitary landfill." N.J.S.A. 13:1E–106. This Fund receives its capital from fees assessed for solid waste disposal in New Jersey. The bulk of the GEMS-related claims herein were submitted and processed under the NJDEPE's 1983 regulations, N.J.A.C. 7:1I–1, *et seq.*, (15 N.J.R. 2034(d) (Dec. 5, 1983)), which procedures were subsequently revised and markedly contracted in coverage in July, 1988, as discussed further below. Upon NJDEPE's payment of any claim from the Fund, NJDEPE would acquire by subrogation the rights of that claimant against the owner or operator of the sanitary landfill. N.J.S.A. 13:1E–111.

According to the Township (Township Br. at 2–3), and not disputed by plaintiff, the NJDEPE received 959 GEMS-related claims for payment from the Fund created by the Act, as of October 22, 1991. Almost all claims are from homeowners living at varying distances up to more than two miles from the landfill. Some bought the property at issue while the landfill was operated, others after it closed in 1980. Some sold their property, most never sold nor offered it for sale. Many claims had not been reviewed by NJDEPE as late 1991. Of the claims reviewed, 296 have been approved by plaintiff and paid by the Fund, with such payments totalling approximately $5.9 million. Of these 296 paid claims, the Township has examined the files in 268 and has found that 252 were claims based totally or in part upon diminution in property value. Of the remaining 16 claims examined by the Township, four (4) were based on physical illness and/or physical intrusion of contaminants from the GEMS landfill, and the remaining twelve (12) did not have a basis that could be discerned from the claim form. *Id.*

NJDEPE now seeks to recover against the defendant owners and operators for its subrogated claims.[5] Defendants in turn seek summary judgment, arguing, *inter alia*, that the NJDEPE exceeded its statutory authority under the Act and that the claims payment procedure implemented by the NJDEPE was constitutionally defective.

Specifically, the Township and Operators allege that NJDEPE exceeded its statutory authority by adding diminution in property value to the types of damages compensable to claimants under the Act. Even if such a claim for diminution in property value could be consistent with the Act, the movants ar-

---

**4.** Defendant Gloucester Township moved for partial summary judgment. Joining in this motion, the Operator Defendants rely on the arguments advanced by the Township, as well as those advanced in their own briefs.

**5.** Other claims asserted by NJDEPE against these defendants, such as under § 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a), and under New Jersey statutes such as the New Jersey Spill Compensation and Control Act, N.J.S.A. 58:10–23.11i, are not at issue in the present motion for partial summary judgment.

gue that the NJDEPE's methodology for paying such claims was arbitrary and resulted in diminution-of-value claims being paid to claimants who had failed to demonstrate that they in fact suffered any such loss. The Township and Operators argue that the NJDEPE improperly paid claims that were time-barred by the one-year statute of limitations of N.J.S.A. 13:1E–107, urging this court to adopt the Act's effective date—January 1, 1982—as the latest triggering date by which a claimant knew or should have known of the damage to their property value caused by the operation and closure of the GEMS landfill, which ceased operations in November, 1980.

The defendants have also argued that the Act was not intended to apply to landfills like GEMS, which allegedly did not fit the definition of a "sanitary landfill" under pre–1988 regulations, as discussed below.

These defendants further argue that payment of these claims created liens which violated their constitutional rights of due process and equal protection.

Each of these arguments is now addressed.

## II. *LEGAL DISCUSSION*

### A. *The Summary Judgment Standard*

A court may grant summary judgment only when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). As the motions by agreement of the parties and court order raise only issues of law rather than fact, *see* Case Management Order No. 12, filed October 7, 1991, no genuine issues of disputed fact exist.

### B. *Was The Compensation of Diminution in Property Value Ultra Vires?*

The Closure Act lists certain types of damages compensable by the Fund, including, but not limited to:

(1) The cost of restoring, repairing or replacing any real or personal property damaged or destroyed;

(2) The cost of restoration and replacement, where possible, of any natural resource damaged or destroyed, including any potable water supply;

(3) The cost of any personal injuries, including medical expenses incurred and income lost as a result thereof;

(4) The costs of the design, construction, installation, operation and maintenance of any device or action deemed necessary by the department to clean up, remedy, mitigate, monitor or analyze any threat to the public health, safety or welfare of the citizens of this State, including the installation and maintenance of methane gas monitors and vents and leachate monitoring wells and collections systems, and the sampling and analysis of any public or private potable water supply.

N.J.S.A. 13:1E–106. Indeed, the same statutory section deems the Fund to be "strictly liable for *all direct and indirect damages ...* proximately resulting from the operation or closure of any sanitary landfill." *Id.* (emphasis added). These statutory provisions are unamended since 1981.

NJDEPE issued implementing regulations in 1983 which broadened this list by making the Fund strictly liable not only for "[t]he cost of restoring, repairing or replacing any real or personal property damaged or destroyed," but also for **"the diminution in fair market value of any real property."** N.J.A.C. 7:1I–1.5 (emphasis added).[6]

 Defendants contend that the NJDEPE's compensation of diminution in property value was unauthorized by the Closure Act. Regulations that exceed the Legislature's grant of authority are deemed *ultra vires.* An *ultra vires* finding is strongly disfavored, and is made only in exceptional circumstances, as administrative regulations are accorded a strong presumption of validity and reasonableness. *City of Newark v. Natural Resource Council,* 82 N.J. 530, 539, 414 A.2d 1304, *cert. denied,* 449 U.S. 983, 101 S.Ct. 400, 66 L.Ed.2d 245 (1980); *New Jersey Guild of Hearing Aid Dispensers v. Long,* 75 N.J. 544, 561, 384 A.2d 795 (1978); *In re New*

---

**6.** As of 1988, approximately $4.8 million of the $5.1 million in claims paid by the Fund were to claimants alleging diminution in property value.

*Citizens for Equity v. New Jersey Dept. of Environmental Protection,* 126 N.J. 391, 395, 599 A.2d 507 (1991).

*Jersey Bd. of Public Utilities,* 200 N.J.Super. 544, 557, 491 A.2d 1295 (App.Div.1985). The party attacking the regulation bears the burden of proving that the administrative regulation is arbitrary, capricious or otherwise unreasonable. *Long,* 75 N.J. at 561, 384 A.2d 795.

In determining whether an administrative regulation is authorized by the statute, "the reviewing court may look beyond the specific terms of the enabling statute to the statutory policy to be achieved by examining the entire statute in light of its surroundings and objectives." *Long,* 75 N.J. at 561–62, 384 A.2d 795. Significantly, "the absence of an express statutory authorization in the enabling legislation will not preclude administrative agency action where, by reasonable implication, that action can be said to promote or advance the policies and findings that served as the driving force for the enactment of the legislation." *In re New Jersey Bd. of Public Utilities,* 200 N.J.Super. at 557, 491 A.2d 1295.

■ In interpreting a regulatory statute, a court must accord great deference to the agency's construction of that statute. *Long,* 75 N.J. at 575, 384 A.2d 795. In fact, the agency's construction is " 'a substantial factor to be considered in construing the statute,' " particularly where the agency is responsible for implementing a newly-enacted statute. *Id.* (quoting *Youakim v. Miller,* 425 U.S. 231, 235, 96 S.Ct. 1399, 1402, 47 L.Ed.2d 701 (1976)).

■ A court may not substitute its judgment regarding the wisdom of an administrative action for the judgment of the agency as long as the action is statutorily authorized and reasonable. *K.P. v. Albanese,* 204 N.J.Super. 166, 176, 497 A.2d 1276 (App.Div. 1985). "If there is any fair argument in support of the agency's action or any reasonable ground for difference of opinion among intelligent and conscientious officials, 'the decision is conclusively legislative, and will not be disturbed unless patently corrupt, arbitrary, or illegal.' " *IFA Ins. Co. v. New Jersey Dept. of Ins.,* 195 N.J.Super. 200, 208, 478 A.2d 1203 (App.Div.), *cert. denied,* 99 N.J. 218, 491 A.2d 712 (1984) (quoting *Flana-*

*gan v. Civil Serv. Dept.,* 29 N.J. 1, 12, 148 A.2d 14 (1959)).

■ NJDEPE's determination that the diminution in fair market value of real property may be compensable under the Act accords with the plain language of the statute and its purposes, and thus is not *ultra vires.* Examining the plain language of the statute, it is important to note that the Closure Act did not limit compensation to the four types of damages listed. Instead, the legislature purposefully made the list non-exclusive, in keeping with the broad remedial purpose behind the statute. The Fund's purpose is to compensate persons for "all direct and indirect damages ... proximately resulting from the operation of a closure of any sanitary landfill," N.J.S.A. § 13:1E–106, *supra.* It was within these broad confines that the NJDEPE expanded the list of examples to include diminution in property value.

■ The impetus for the Act's passage was the Legislature finding in pertinent part "that compensation for the damage resulting from improper operation or closure is, at best, inadequate; and that it is necessary to provide a mechanism for the prompt and adequate compensation for these damages." N.J.S.A. 13:1E–101. As discussed more fully *infra,* the Act created an extra-judicial procedure for adjudicating common law nuisance claims. Under the common law, diminution in value may be recovered in a nuisance action. *See, Barberi v. Bochinsky,* 43 N.J.Super. 186, 190, 128 A.2d 1 (App.Div. 1956).

The Legislature has chosen to leave NJDEPE's well-known and long-standing interpretation undisturbed. As the New Jersey Supreme Court has recognized, "[a]n agency's construction of a statute over a period of years without legislative interference will generally be granted great weight as evidence of its conformity with the legislative intent." *Last Chance Development Partnership v. Kean,* 119 N.J. 425, 434, 575 A.2d 427 (1990). Had the Legislature disagreed with compensating diminution in value claims, the Legislature could easily have corrected NJDEPE's misinterpretation. Under New Jersey's rule of statutory interpretation,

the fact that it did not further supports NJDEPE's interpretation.

Defendants contend, nonetheless, that such an expansion is void under the doctrine of *ejusdem generis*. This doctrine of statutory construction provides that when specific items are listed in a statute as part of a general category, only items similar to those enumerated are included in that general category. *See* 2A *Sutherland Statutory Construction* § 47.17 (4th ed. 1984). A court may not resort to this rule until first determining the intent of the legislature in drafting the statute. *State v. Port Authority of New York and New Jersey*, 151 N.J.Super. 127, 133–34, 376 A.2d 591 (Law Div.1977), *aff'd*, 159 N.J.Super. 102, 387 A.2d 367 (1978).

Defendants argue that because diminution in property value is "intangible," while the other listed damages are "tangible," the former does not belong in the latter category of physical, tangible damages. The court disagrees with defendants' analysis. Actual diminution in property value is not so qualitatively different from physical damages to property as to be outside the realm of legislative purpose and intent. For a claimant whose principal asset is a home and the land on which it is situated, diminution in the value of that asset is no less real or harmful than physical damage. The NJDEPE's inclusion of diminution in value claims recognizes an important type of damage to the community that is caused, in the words of the Closure Act, "directly or indirectly" by a large landfill like GEMS.

Had the NJDEPE disregarded the Legislature's delegation of discretion to craft an appropriate list of compensable damages, many claimants would have been left without a remedy. Such a result would contravene the broad legislative purpose behind the Act, a quintessentially remedial statute. Accordingly, the court finds that the inclusion of diminution in value claims by the NJDEPE was not *ultra vires* and thus denies summary judgment as to this issue.

### C. Was The Appraisal Procedure Arbitrary and Capricious?

#### 1. Valuation of Diminution of Value Claims under NJDEPE Procedures before July 18, 1988.

Neither the Act nor the 1983 regulations promulgated by the NJDEPE imposed a procedure for evaluating diminution in property value claims. Instead, the 1983 regulations merely stated that "[t]he department will consider only those damages for which the claimant can produce substantial evidence." N.J.A.C. 7:1I–1.7(a). In practice, the NJDEPE devised a formula to be applied to each claimant's home. Essentially, the NJDEPE would add an "appreciation factor" [7] and the value of any improvements to the purchase price of each home to arrive at a "net value." The NJDEPE would then deduct 25% [8], to reflect "an estimated decrease in the realty's fair market value," irrespective of the actual dates of purchase or sale, nor whether any sale was actually ever attempted. This 25% figure, plus estimated costs of moving and resettlement, would then be awarded without any requirement for substantial evidence of an actual diminution in the subject property's value.

NJDEPE applied this −25% factor across the board, no matter the individual circumstances of the claimant or the location of the property. Thus, the value of a home one mile from the landfill would receive the same

---

7. This appreciation factor was derived from Marshall & Swift's Residential Cost Handbook, which apparently estimates the normal appreciation in the value of residential property over time, irrespective of the actual values of any particular properties. See NJDEPE Br. at 20–22 and Township's Br. at 29.

8. The NJDEPE nowhere explains the basis in fact for the 25% reduction figure. Instead, NJDEPE simply acknowledges it determined the diminution or decrease "by applying a factor of −25% to the net value as calculated above, to which was added the claimant's original settle-ment costs." NJDEPE Br. at 20. Later, NJDEPE defends the 25% diminution figure, again without proving that this assumption had a meaningful basis:

In electing to provide compensation on a standardized basis (i.e., applying a 25% diminution figure to all claimants), NJDEPE was able to process more quickly the mounting number of claims, and to avoid the expense and time of having teams of appraisers assess ultimate home values on a case by case basis.
NJDEPE Br. at 21.

−25% diminution in value factor as one contiguous to it. A home purchased in one year, as to which the homeowner claimed diminution in value in the next year, would recover a 25% diminution factor from the Fund. Further, the homeowner may have purchased the property at a depressed market price reflecting known proximity to the landfill; the formula nonetheless assumes that the marketplace was unaware of the landfill's existence at the time of every purchase, resulting in compensation for a loss that may not have, and in all likelihood would not have, in fact occurred.

Significantly, the homeowner was not required to sell or even attempt to sell the home in order to receive compensation.[9] NJDEPE simply assumed that a diminution in value of claimant's property had occurred, that it was caused by the landfill rather than other market forces, and that it amounted to 25% of the home's "net value."

This liberal approach to resolving diminution in value claims created unintended consequences, leading the NJDEPE to overhaul its regulations in 1988. As NJDEPE explained:

> Based on past experience, the Department determined **in connection with the GEMS landfill, its largest claims area to date,** that claims were being filed for homes farther and farther away from the landfill and were in a pattern unrelated to the effects of the landfill itself. This trend[ ] in the area of property value diminution indicated the creation of the very condition which the law was established to remedy.

20 N.J.Reg. 1732, 1735 (July 18, 1988) (emphasis added); see also Citizens for Equity v. New Jersey Dept. of Environmental Protection, 126 N.J. 391, 395, 599 A.2d 507 (1991) (David C. Mack, Acting Administrator of NJDEPE's Environmental Claims Administration explaining that "[o]nce a claim was satisfied without requiring the property to be sold, that settlement seemed to promote the perception of similar damages to surrounding properties.") NJDEPE further reported that "[p]ast claims handling experience has

shown that any correlation between property diminution and the presence of the landfill may be highly questionable."

Believing that the Department [could not] **continue** to settle claims in a manner it finds to be **contrary to its statutory duty,** 20 N.J.Reg. 1734 (emphasis added), the NJDEPE amended its regulations to include a "sale requirement," whereby a claimant could only collect on the Fund once he sold his house or tried in good faith to sell it. In that way, the value of the house would be fixed by the sale price, rather than by the NJDEPE formula. As NJDEPE explained, "the Department believes that one factor in the development of any past diminution was due to its past settlement practices. To reverse the trend that has developed, the new rules require that properties be marketed at full value absent the landfill, an offering price value which the Department believes would more approximate the property's true value." Id. at 1736.

■ Defendants claim that NJDEPE's pre–1988 procedure violated their substantive due process rights, and thus that claims compensated under that procedure must be dismissed. Substantive due process requires that a law not be unreasonable, arbitrary or capricious, and that the means selected bear a rational relation to the legitimate aim sought to be achieved. Sea Girt Restaurant v. Borough of Sea Girt, 625 F.Supp. 1482, 1491 (D.N.J.), aff'd, 802 F.2d 448 (3d Cir. 1986) (challenging statute allowing regulation of hours of sale of alcohol by local referendum); see also Worthington v. Fauver, 88 N.J. 183, 204, 440 A.2d 1128 (1982) (holding that Commissioner of Corrections' decision to house state prisoners in county jails to alleviate overcrowding not arbitrary or capricious).

In its defense, NJDEPE argues that its appraisal procedure was rationally related to the legislative purpose behind the Act. According to the NJDEPE, "[i]n electing to provide compensation on a standardized basis (i.e., applying a 25% diminution figure to all claimants), NJDEP[E] was able to process more quickly the mounting number of

---

**9.** In fact, homeowners who chose not to sell or move from their homes still received compensation for moving and resettlement expenses under the NJDEPE's pre–1988 policies.

claims, and to avoid the expense and time of having teams of appraisers assess ultimate home values on a case by case basis." Pl.Br. at 21.

 Neither expense nor expediency may justify abandoning standards of substantive due process. As the *Citizens for Equity* court noted, "the statutory requirement for 'prompt' compensation [does not] require the agency to forego necessary but time consuming steps to satisfy itself of the validity of claims." *Citizens Equity*, 252 N.J.Super. at 72, 599 A.2d 516. Nor does a sense of urgency exist where, as here, the majority of claimants never moved from their homes.

 Simply assuming that a diminution in value occurred in some fixed amount of unknown origin, without any meaningful investigation into a claimant's individual circumstances, and without regard to any actual market data arising from a sale or attempted sale of the home, is an arbitrary and wasteful methodology. While the agency enjoyed a broad legislative mandate, this does not excuse it for acting outside the confines of rationality. Ultimately, as the NJDEPE knew, defendants would be held responsible for any claims reasonably paid by the Fund. The procedure implemented by NJDEPE was, both facially and practically, unreasonable. In fact, the NJDEPE itself admitted as much [10], as discussed above.

Under NJDEPE's compensatory scheme, claimants who had suffered no actual damage recovered substantial amounts of money from the Fund. The Fund paid claims for diminution in value where the property was never sold or offered for sale. The NJDEPE adopted an automatic market deflation factor of 25% without rational explanation. Such a windfall-creating procedure was arbitrary and capricious, and thus fatally flawed. Furthermore, this court finds that this administrative claim procedure also violated the agency's own regulations which required, as noted above, that the department "will consider only those damages for which the claimant can produce substantial evidence." N.J.A.C. 7:1I–1.7(a). Accordingly, the court grants summary judgment dismissing NJDEPE's cause of action for all diminution in value claims paid under the pre–1988 procedure.

### 2. Valuation of Diminution of Value Claims Under NJDEPE Regulations On and After July 18, 1988.

 The Operators also have challenged the amended mechanism for paying diminution of value claims promulgated in July of 1988, 20 N.J.R. 1732–1743 (July 18, 1988), codified at N.J.A.C. 7:1I–1.1, *et seq.* Under the 1988 amendments, the NJDEPE has tightened the eligibility criteria for diminution of value claims to require the sale of the property [11] or an inability to sell after one year of continuous good faith attempts to do

10. Relying by analogy on Fed.R.Evid. 407, NJDEPE argues that the fact that it amended its procedures in 1988 is not admissible to prove that the original regulations were constitutionally void. Rule 407 provides in pertinent part:

When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligent or culpable conduct.

Invoking the policy considerations behind the rule, NJDEPE argues that if the court accepts defendants' argument, "legislatures and agencies would be loathe to make any improvements in existing statutes and regulations for fear that those who feel 'victimized' by prior, duly enacted laws would sue for compensation."

In deciding this motion, the court does not rely on the mere fact that NJDEPE revised its appraisal procedure as evidence of the original regulations' constitutional defects. Instead, this court relies on NJDEPE's own public statements criticizing those regulations. *See* Rule 801(d)(1). The New Jersey privilege of critical self-analysis

is not implicated here because the self-criticism by NJDEPE was public, indeed, it was the basis for promulgating amended regulations.

Moreover, while the law should not discourage agencies from correcting past mistakes, neither should it allow agencies to immunize themselves from responsibility by merely confessing error and revising constitutionally deficient procedures. Accordingly, the court finds NJDEPE's reliance on Rule 407 misplaced.

11. N.J.A.C. 7:1I–3.3(a) & (b) (1988) provided:

(a) Claims for real property value diminution as a result of the operation or closure of a sanitary landfill are compensable upon sale of the property. The claimed property must be located within one-half mile of the landfill area except:

1. Claims for property value diminution which were filed prior to March 7, 1988 are not subject to the one-half mile limitation, or to the criteria at (d) below if the damaged property was sold prior to July 18, 1988, but shall

so, measured from the date of listing with a multiple listing service licensed real estate broker.[12] Detailed regulations were enacted in 1988 to reasonably assure a true fair market value determination under the criteria of N.J.A.C. 7:1I–3.3, including notification procedures for persons who filed property value diminution claims before March 7, 1988, instructing claimants about the new procedures and giving each claimant an option of requesting that the claim be suspended for up to two years, or withdrawn, pursuant to N.J.A.C. 7:1I–3.3(c).[13]

The 1988 mechanism was upheld as a reasonable limitation upon recovery for diminution of value claims, in a suit by pre–1988 claimants who alleged that the new restrictions upon proofs were unfair and allegedly inconsistent with the statutory requirement for "prompt and adequate compensation," pursuant to N.J.S.A. 13:1E–101, *supra*. *Citizens for Equity v. New Jersey Dept. of Environmental Protection*, 252 N.J.Super. 62, 70–71, 599 A.2d 516 (App.Div.1990), *aff'd*, 126 N.J. 391, 599 A.2d 507 (1991). The provision of the 1988 amendments in N.J.A.C. 7:1I–3.3(a) that restricted certain diminution of value claims, not involving physical intrusion, to locations within one-half mile of the landfill was struck down by the Appellate Divi-

meet all other criteria of this section. Damaged property shall be considered sold prior to July 18, 1988 if a binding agreement of sale was entered into prior to this date.

2. Claims for property diminution which include physical intrusion are not subject to the one-half mile limitation but shall meet all other criteria of this section.

(b) All claims file subsequent to the effective date of this chapter for which the property has been sold prior to receipt of an appraisal of the subject property value from the Department are barred from compensation.

12. N.J.A.C. 7:1I–4.2 (1988) provides:

(a) Upon satisfactory sale of a property pursuant to the requirements of N.J.A.C. 7:1I–3.3, the Department will pay the claimant damages in an amount equal to the Department's appraisal of the property value absent the landfill minus the actual selling price.

(b) In the event that a claimant makes a good faith attempt to sell the property in accordance with the requirements of N.J.A.C. 7:1I–3.3 and cannot do so within one year measured from the date of the initial real estate listing, the Department will, upon verification of the good faith nature of the attempt, appraise the value of the property absent the landfill and survey sales base claims settlements in the area to determine the average percentage diminution for the area. The Department shall pay, as damages, the dollar value arrived at by multiplying the appraised value of the property absent the landfill by the average diminution percentage determined for the area.

1. If a sale occurs within two years after initial settlement with the Fund, upon satisfaction of all requirements of N.J.A.C. 7:1I–3.3(f), a further claim may be awarded based on a comparison of the initial settlement paid with actual diminution. Actual diminution shall be determined by subtracting the sales price received from the appraisal value of the property absent the landfill. The Department may pay the difference between the two figures where the actual diminution is greater then (sic) the initial settlement paid. If the initial settlement paid is greater than the actual diminution upon sale, the claimant shall be liable to the Fund for the excess settlement received. Payback of excess settlement received must be made within 10 days of property settlement.

i. In order to qualify for additional payments under this subsection the claimant may not reduce the asking price by more than 2.5 percent per month after initial settlement with the Fund without written permission from the Fund.

(c) The Department will not, in compensating damages claimed under (a) or (b) above, include in its calculation of the appraisal of the value of the damaged property, the values of any improvements to the property made after the date of discovery of damages.

(d) If settlement under this section occurs more than two months after the Department's appraisal, the Department will adjust the appraisal value used in calculating settlement or determining adjustments to initial settlement to reflect appreciation or depreciation of real estate values in the area.

13. N.J.A.C. 7:1I–3.3(c) states:

The Department shall notify each claimant who filed a claim before March 7, 1988 of the requirements of this chapter. Such claimants shall then have 60 days from receipt of such notice to inform the Department by certified mail return receipt requested, of their intent to pursue their claim for property value diminution pursuant to this chapter, immediately, request that the claim be suspended for a period of up to two years, or to withdraw that claim for those damages. If a claimant requests suspension of their claim, the claimant may at any time during the period of suspension, request reactivation of the claim. At the end of the two year suspension period, the claim will be automatically reactivated, unless the claimant has previously withdrawn the claim. Priority status of reactivated claims will be estab-

sion. *Id.*, 252 N.J.Super. at 71–74, 599 A.2d 516, *aff'd*, 126 N.J. 391, 599 A.2d 507 as discussed below in Part II.D.

The Operator defendants have not shown in this motion how the post–1988 market-based compensation system is arbitrary or capricious. The NJDEPE's 1988 amendments established "objective, neutral standards by which the fact and extent of value diminution damage [is] to be determined," as the *Citizens for Equity* court found, 252 N.J.Super. at 71, 599 A.2d 516, and as this court now finds. The movants have not met their burden of proving that the administrative regulation amendments in July 1988 resulted in a compensation scheme that was arbitrary, capricious or otherwise unreasonable. *Long*, 75 N.J. at 561, 384 A.2d 795. The new scheme indeed takes the relevant economic factors of the particular property into account in measuring diminution of value, and it properly restricts compensation to properties that were actually sold or held out for sale in good faith through a multiple listing broker for one year. The reconstructed market value for such unsold homes is computed not by a generalized diminution factor but instead from actual market loss data, namely, "the average diminution percentage determined for the area," N.J.A.C. 7:1I–4.2(b), *supra*. Although this court expresses no opinion regarding the manner in which the post–1988 regulations have actually been applied in any individual claim (because no examples of post–1988 claim processing have been included in the record) [14], it is clear that the regulatory mechanism itself suffers from no impairment in its approach to diminution of fair market value determinations. Therefore, the motion for summary judgment will be denied with respect to the facial validity of the July, 1988 regulations [15] for compensating diminution of value claims.

> lished based on the date of receipt of the reactivation request.

**14.** The NJDEP's claim for reimbursement of such post-July 1988 payments will be subject to the department's burden of proving that substantial evidence supports its decision to pay each claim, as discussed in Part II.F.1, below.

### D. Geographical Limitations On Diminution In Value Claims

Defendants also seek to limit diminution in value claims to land contiguous to the landfill. A similar limitation has already been considered and rejected by the New Jersey state courts. *See Citizens for Equity v. New Jersey Dept. of Environmental Protection*, 252 N.J.Super. 62, 599 A.2d 516 (App.Div.1990), *aff'd*, 126 N.J. 391, 599 A.2d 507 (1991).

In amending its appraisal procedure in 1988, NJDEPE had also sought to limit awards for diminution in value to property located within a half-mile radius of a landfill. Claimants outside that limit would be required to show both physical intrusion and diminution in value to receive compensation. While the revised claims procedure successfully withstood a legal challenge by disgruntled claimants, the geographic limitation was struck down as *ultra vires*.

As the Appellate Division stated:

> [NJDEPE] does not have authority to limit the scope of the statutory liability by fashioning territorial requirements for recovery. Nor can the territorial restriction be justified as an administrative determination that, in the absence of any physical intrusion, a landfill could not proximately cause diminution of value beyond one-half mile. . . . [S]ince the Fund liability at issue here is for diminution of value without physical intrusion, the absence of physical intrusion cannot alone establish the absence of value diminution.

252 N.J.Super. at 74, 599 A.2d 516.

This reasoning applies with equal force to defendants' argument in the case at hand. Accordingly, summary judgment is denied as to this issue.

**15.** Likewise, the Operators' challenge to the amendments to the Fund's regulations pertaining to diminution of value claims, effective February 22, 1994, in 26 N.J.R. 1114, is unavailing. The 1994 amendments are substantially similar in relevant part to the 1988 amendments. Compare, *e.g.*, N.J.A.C. 7:1I–4.1 (eff. Feb. 22, 1994) with N.J.A.C. 7:1I–3.3 (eff. July 18, 1988).

### E. Were Claims Paid By The NJDEPE Time-barred?

The Closure Act provides that "[c]laims against the fund shall be filed within 1 year of the date of discovery of damage, and in the manner as shall be prescribed by the department." N.J.S.A. 13:1E–107. Arguing that passage of the Closure Act was prompted solely by the GEMS landfill, defendant Gloucester Township contends that the Legislature intended the "date of discovery" to be the date upon which the Closure Act became effective, January 1, 1982. Accordingly, it argues, any claims brought after January 1, 1983 are time-barred.

Gloucester Township theorizes that by adopting the "date of discovery," the Legislature merely intended to allow claimants to pursue otherwise time-barred claims, that is, claims arising before 1981, and not to allow payment for claims "discovered" years after the Act's passage. This theory rests on the fact that Senator Dalton, one of the five Assembly cosponsors of the Act, represented the legislative district in which the GEMS landfill was located.

Ironically, the Operators counter the Township of Gloucester's argument most effectively. First, they note correctly that Gloucester Township's contention relies not on "legislative history or any other source" but rather on "coincidence;" although Senator Dalton introduced the bill, his district includes the Kinsley, Mac and Fazzio landfills in addition to GEMS. Thus, it is just as likely that concern over these other landfills also motivated the Senator. ·

Second, GEMS had already closed when the Act passed, yet its thrust is prospective in nature. See N.J.S.A. 13:1E–101 ("The Legislature finds and declares ... that closure activities **can** require capital expenditures at a time when revenues collected by sanitary landfill facilities are minimal or nonexistent; ....that the improper operation or closure of sanitary landfill facilities **can** result in the contamination of surface and groundwaters ...; that the migration of methane gas from sanitary landfill facilities

poses a significant threat to life and property.") (emphasis added).

The notoriety surrounding GEMS may have been an important motivating factor behind the Act's passage. Even if the GEMS situation were the forefront of the Legislature's mind in 1981, the Legislature has made no presumption that GEMS has caused its harm to all properties alike and no future harm could occur. Instead, the Legislature adopted the date of discovery trigger to encompass all landfill hazards, past, present and future.

In addition, Gloucester Township overlooks the fact that the Legislature could easily have chosen a date certain or included a "sunset provision"; but rather chose to adopt the more liberal "date of discovery of damage" to trigger the limitations period. Accordingly, the court declines to read a date into the statute which lacks support in either fact or law.

Taking a somewhat different tack, defendants alternatively urge this court to find that persons buying property after November 4, 1980, the date the GEMS landfill closed, knew or should have known of the site's contamination problem. Because such persons, defendants argue, voluntarily assumed the risk involved in owning property near the landfill, their claims must be noncompensable.

Defendants' argument mixes concepts of timeliness and knowledge. As this court has already found, the sole time limitation on claimants is one year from the date of discovery of damage. The date of discovery of damage depends upon the facts surrounding each particular claim. The Closure Act does not start the statute of limitations upon the "date of discovery of the Landfill," as the movants apparently argue. The date on which a claimant should have become aware of damage is the date on which the statute of limitations commences. It is quite plausible, for instance, that the statute of limitations for certain diminution in value claims has not yet been triggered. For example, it appears that if a home near the GEMS landfill was purchased in 1970 without knowledge in the marketplace [16] of the deleterious impact of

---

**16.** If the real estate marketplace had knowledge of the deleterious proximity of the GEMS Land-

the landfill, and the home is resold for the first time in 1994 at a loss in value proximately caused by the landfill's operation or closure, the first occurrence of recognized "damage" for diminution of value occurs on the sale date in 1994, starting the one-year statute of limitations for previously unrealized loss of value.[17]

Finally, Gloucester Township argues that plaintiff has paid claims which were barred even under the NJDEPE's application of the discovery rule. Such an argument is inappropriate in this context. Determining the date of discovery is necessarily a fact-specific exercise. All parties have agreed, and the court has ordered, that the instant motion for summary judgment would exclude any fact-specific inquiries. *See* Case Management Order No. 12. Accordingly, this portion of defendant's argument is also premature and will be denied without prejudice.

### F. Defendants' Constitutional Claims

#### 1. Did The Claims Procedure Violate Defendants' Due Process Rights?

■ Under NJDEPE regulations, claimants may contest a claims decision by the NJDEPE by requesting a hearing before an administrative law judge. N.J.A.C. 7:1I–5.4. Defendants argue that because they are denied the same opportunity, their rights to due process and equal protection have been violated.[18]

Procedural "due process is the opportunity to be heard at a meaningful time and in a meaningful manner, but the concept is flexible, calling for procedural protection as dictated by the particular circumstance." *Kahn v. United States*, 753 F.2d 1208, 1218 (3d Cir.1985). "Where only property rights are involved, mere postponement of the judicial enquiry is not a denial of due process, if the opportunity given for the ultimate judicial determination of the liability is adequate." *Id.* at 1219 (quoting *Phillips v. Commissioner*, 283 U.S. 589, 596–97, 51 S.Ct. 608, 611, 75 L.Ed. 1289 (1931)).

Courts must undertake a three part analysis to determine whether due process requires a pre-deprivation hearing in any given case.[19] *Id.* However, the court need not embark on that inquiry, because pre-deprivation hearings will be made available to the owners and operators.

To understand this issue, we must first understand the process by which claims are paid. The Fund is financed by taxes levied on every solid waste transaction conducted in the state. N.J.S.A. 13:1E–104. Once a claimant is paid by the Fund, the NJDEPE

---

fill, the market price presumably already reflected that knowledge in the price. Assuming that the local real estate market already discounted property values in the landfill vicinity at some point in time, the purchaser acquired the property at the depressed price. Unless conditions worsened thereafter, the market value of that property will not be apt to decline further based on landfill proximity. It is doubtful that persons who purchased homes after the marketplace already reflected negative impacts from proximity to the GEMS Landfill will suffer a loss in property value thereafter, assuming conditions did not worsen. This economic fact applies to the knowledge of the marketplace, independent of what the individual purchaser actually knew. Quite apart from any statute of limitations issue, if one could determine the date when the local marketplace had acquired sufficient knowledge of the notoriety of the GEMS Landfill to discount neighborhood property values, and if one could also determine whether property values thereafter stabilized, then one could establish the date after which property purchased in the GEMS area in fact would not have suffered diminution in value, again independent of the actual knowledge of the individual purchaser.

**17.** The prospect of such a claim being successfully asserted in the future would appear to be minimal, as no evidence in this motion supports such a long term decline in area property values. Further, in the case of any physical damage or personal injury, the discovery of damage for such claims triggered the one-year statute of limitations years ago, in all likelihood.

**18.** For purposes of this motion, it is assumed that Gloucester Township, a municipality, may raise equal protection and due process claims against the state. *See* Township Br. at 32–35 (discussing availability of such claims against state).

**19.** A court must consider "(1) the private interest that will be affected by the official action; (2) the risk of erroneous deprivation of such interest through additional procedural safeguards, and (3) the government's interest in additional adjudicative process." *Kahn*, 753 F.2d at 1219 (citing *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976)).

acquires by subrogation all claims and rights held by that claimant against the owners and operators of the landfill. N.J.S.A. 13:1E–111.

Until NJDEPE prevails in the pursuit of its subrogated claims, defendants have suffered no deprivation of property.[20] In order to prevail, NJDEPE must stand in the shoes of the claimant, and prove in a court of law that substantial evidence supports the department's determination that the claimant suffered actual damages recoverable under the Closure Act. At that time, defendants are free to rebut the evidence presented by the NJDEPE, and to proffer their own evidence. Accordingly, defendants will receive full due process protection in a judicial forum before any deprivation of property occurs.

2. *Defendants' Equal Protection Claims.*

■ Defendants claim that the NJDEPE regulation and the Act violate their rights to equal protection first, by affording claimants but not owners and operators the right to an administrative hearing and second, by "singling owners and operators out for liability" without imposing similar liability upon generators and transporters of hazardous wastes.

■ To withstand constitutional scrutiny under the equal protection clause, a state must demonstrate that a classification is rationally related to achieving a legitimate governmental objective.[21] *New Jersey State League of Municipalities v. New Jersey*, 257 N.J.Super. 509, 518, 608 A.2d 965 (App.Div. 1992), *cert. dism'd*, 133 N.J. 423, 627 A.2d 1132 (1993). "In general, the Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification." *Id.* (quoting *Nordlinger v. Hahn*, —— U.S. ——, ——, 112 S.Ct. 2326, 2332, 120 L.Ed.2d 1 (1992)). The challenger, who bears the burden of proving the classification "palpably arbitrary or capricious," "must refute all possible rational bases for the differing treatment, whether or not the Legislature cited those bases" as reasons for the differential treatment. *Id.* (citing *Chamber of Commerce*

*v. New Jersey*, 89 N.J. 131, 445 A.2d 353 (1982)). Moreover, the classification must be upheld if the court "can conceive of any reason to justify" it. *Id.* (quoting *Newark Superior Officers Ass'n v. City of Newark*, 98 N.J. 212, 227, 486 A.2d 305 (1985)).

The Legislature's purpose in passing the Closure Act was to provide "prompt and adequate" compensation to landfill victims. N.J.S.A. 13:1E–101. Both classifications at issue are rationally related to achieving that governmental objective.

The Legislature found that it would take years for claimants to receive compensation from defendants through the traditional judicial process. To avoid the delay in identifying and joining potentially responsible parties and conducting pretrial discovery and motion practice in complex environmental litigation, the Legislature created a streamlined, extra-judicial compensation process.

Furthermore, to circumvent the well-known difficulties in identifying responsible parties in this type of litigation, the Legislature imposed liability on owners and operators alone. *See, e.g., Lamb v. Global Landfill Reclaiming*, 111 N.J. 134, 150–51, 543 A.2d 443 (1988); *Ayers v. Jackson Twp.*, 106 N.J. 557, 581–82, 525 A.2d 287 (1987). Damages caused by the ineffectual operation or closure of a landfill often manifest themselves decades after transporters and generators have dumped their wastes. *Ayers*, 106 N.J. at 583, 525 A.2d 287. Ineffective record keeping, changes in company ownership, and other developments make identification of responsible generators and transporters a herculean task.

By comparison, identifying owners and operators of landfills is relatively straight-forward. Owners and operators are fewer in number, and traceable through public records. Once identified, the NJDEPE can sue to reimburse the Fund, and in turn, the owners and operators can likely sue the transporters and generators for contribution

---

20. The disposition of the pre–1988 diminution in property value claims, *see* II.C.1, *supra*, illustrates this fact. Where such diminution in value claims were improperly paid, it is the Fund, not the defendants, which is ultimately liable.

21. Defendants concede that the rational basis tier of review is appropriate in this case. *See* Brief of Owners and Operators ("Owners & Operators Br."), at 16.

although this contribution issue is neither pressed nor decided at this time. *See* Owners & Operators Br., at 15 n. 2. Indeed, the owners and operators have asserted such claims for contribution against alleged generator, transporter and municipal entities.

Such a scheme ensures prompt and low-cost reimbursement of the claimants, and ultimately of the Fund, while allowing owners and operators to seek to distribute the financial burden among the other responsible parties through a contribution action, if allowed by law. Allowing defendants to contest each claim at the initial hearing stage, and forcing the state to identify all responsible parties before compensating claimants, would completely undermine this streamlined compensation scheme. Accordingly, the court denies summary judgment with respect to defendants' equal protection claims.

### G. *Was The Act Intended To Apply To Landfills Like GEMS?*

 The defendant Operators argue that GEMS should not be considered a "sanitary landfill." In 1970, the Legislature passed the Solid Waste Management Act, N.J.S.A. 13:1E–1, *et seq* ("SMWA"), but failed to define the term "sanitary landfill." Not until 1983 did the NJDEPE define the term, explaining that

> "sanitary landfill" means a solid waste facility at which solid waste is deposited on or in the land as fill for the purpose of permanent disposal or storage for a period exceeding six months, **except that it shall not include any waste facility approved for disposal of hazardous waste pursuant to this chapter.**

N.J.A.C. 7:26–1.4 (emphasis added). This definition was subsequently codified by the Legislature and incorporated into the SMWA. *See* N.J.S.A. 13:1E–3(q); N.J.S.A. 13:1E–5.3; N.J.S.A. 13:1E–137(w).

In 1981, the Legislature passed the Closure Act as a supplement to the SMWA. In 1988, the NJDEPE promulgated a regulation which adopted the following definition of "sanitary landfill:"

a facility which **is, or at one time was, governmentally approved,** at which solid waste (including hazardous waste) is or has been permanently deposited, disposed or otherwise discarded on or into the land as fill.

N.J.A.C. 7:1I–1.5 (emphasis added).

Defendants contend that the 1988 NJDEPE regulatory definition contravenes "the legislature's clearly expressed desire to exclude landfills like GEMS from its definition of 'sanitary landfill.'" Owners & Operators' Br., at 20. Citing evidence which purportedly demonstrates that GEMS was authorized to handle hazardous wastes, defendants argue that GEMS was not a "sanitary landfill" under pre–1988 NJDEPE regulations, and thus that the operators and owners are not liable for claims paid during that period.

According to defendants, on June 5, 1970 the NJDEPE sent a letter to Gloucester Township officials advising that defendant Anthony Amadei, Jr. had requested permission to accept "chemical wastes from Rohm & Haas" for disposal at the GEMS landfill. *See* Owners & Operators Br., Exhibit A. The NJDEPE stated that it "would not object at this time to the acceptance of these types of [chemical] wastes," but if a "threat of pollution exists, it may become necessary to curtail immediately the acceptance of these types of waste." *Id.* Twenty-one days later, NJDEPE revoked this letter on June 26, 1970 after the Rohm & Haas waste caught fire. *See id.,* Exhibit B. According to defendants, the GEMS landfill was reauthorized to accept chemical wastes on August 11, 1970, *see id.,* Exhibit C, until permission was again revoked 38 days later on September 18, 1970. *See id.,* Exhibit D.

Even accepting the dubious proposition that these letters authorized GEMS to handle hazardous wastes,[22] defendants' argument must be rejected. Under defendants' theory, the Legislature knew that ten years prior, GEMS was "governmentally approved" to accept chemical waste during a seven week period, and on that basis it specifically

---

**22.** As NJDEPE notes, the letters never specified whether GEMS was authorized to handle hazardous, as opposed to non-hazardous, chemical waste. *See* Pl. Opposition Br. at 33–34.

intended to immunize GEMS from Closure Act liability.

The Legislature passed the Closure Act partly in response to what it perceived as a crisis at GEMS. *See* II.C., *supra.* To argue that by codifying the SMWA definition of sanitary landfill the Legislature intended to immunize GEMS owners and operators from liability under the Closure Act flies in the face of the broad legislative purpose behind the Act. Accordingly, the court must deny defendants' motion for summary judgment with respect to this issue.

## III. *CONCLUSION*

The court will grant summary judgment to defendants with respect to pre–1988 diminution in property value claims, but deny summary judgment with respect to all other issues.

The accompanying Order is entered.

## ORDER GRANTING IN PART, AND DENYING IN PART, MOTION FOR SUMMARY JUDGMENT BY TOWNSHIP OF GLOUCESTER AND OPERATOR DEFENDANTS CONCERNING CLOSURE ACT CLAIMS

This matter having come before the court on the joint motion for partial summary judgment by defendants Township of Gloucester, Amadei Sand & Gravel, Inc., Anthony Amadei, as officer, shareholder and/or director of Amadei Sand & Gravel, Inc., Gloucester Environmental Management Services, Inc. ("GEMS"), Richard Winn, David Ehrlich, and Anthony Amadei, as officers, shareholders and/or directors of GEMS only;

This court having carefully reviewed the submissions of both parties and the oral arguments previously held, together with the supplemental submissions of these parties;

For the reasons set forth in the court's Opinion of this date;

**IT IS** on this 1st day of September, 1994 hereby

**ORDERED** that defendants' joint motion for partial summary judgment is **GRANTED IN PART,** in that it is ADJUDGED that plaintiff's claims based solely on diminution in property value (without physical damage) under the New Jersey Sanitary Landfill Closure and Contingency Fund Act, N.J.S.A. 13:1E–100, *et seq.,* with respect to such claims as were paid to property owners under the procedures in effect prior to implementation of the regulations at N.J.A.C. 7:1I–1.1, *et seq.* (effective July 18, 1988), be and they hereby are **DISMISSED;**

**IT IS FURTHER ORDERED** that the remainder of defendants' joint motion for summary judgment is **DENIED.**